CATHARINE COLE et al.

*vs.*

GEORGE MAXFIELD.

A quit-claim deed executed in May, 1854, of unsurveyed U. S. land in the Territory of Minnesota, was inoperative.

A new trial should not be granted on account of the reception of immaterial testimony, where there is no reasonable ground to apprehend that injustice was done by its reception, or that the jury were misled by it to the substantial prejudice of the party objecting to its admission.

A tenant is not estopped from denying his landlord's title, and setting up title in himself adverse to the landlord, as against a stranger.

The town site of Mankato was purchased from the United States by the judge of the proper court, in trust for the use and benefit of the occupants, under the act of Congress com-

monly called " The town site act." The parties to this suit were contesting claimants for a certain portion of said town, (six blocks in fractional lot three, entered as part of the site,) seeking to obtain title thereto from the judge holding the same. The complaint alleges, among other things, substantially, that the plaintiff, Catharine Cole, is the widow of Hoxie Rathbun, deceased, and that the other plaintiffs are his children and heirs ;. that said Rathbun settled upon the six blocks in controversy, in 1853, and occupied them until his death, in December, 1856 ; that after his decease, the plaintiffs continued the occupancy and claimed the property as their own ; that the defendant, combining with one Daniel T. Bunker to defraud said Rathbun, induced said Bunker to purchase certain lands of said Rathbun, including the six blocks ; that said Bunker agreed with said Rathbun to give his note for $500 therefor; whereas he gave his note for $50, only, and induced Rathbun, who could not read, to accept it under the belief that it called for $500, whereby he procured a quit claim deed for the lands, and afterwards conveyed to defendant. The plaintiffs demanded that these deeds be set aside, and the property be adjudged to belong to them.

The answer alleged that defendant was the first occupant ; that Rathbun's occupancy commenced after defendants, and was for a certain company called the " Old Mankato Company;" alleged that Bunker procured said deed from Rathbun, without the knowledge or inducement of the defendant, and denied the fraud charged.

The deed from Rathbun to Bunker was executed in May, 1854. The United States government survey of the lands embraced in the site was made in 1855.

The cause was tried before the Court, with the assistance of a jury, to whom were submitted seventeen distinct interrogatories; to which interrogatories the jury returned spe-

Cole et al., v. Maxfield.

cific answers. The findings of the Court, and the special verdict of the jury, being in favor of plaintiffs, judgment was ordered for the relief demanded. The defendant moved for a new trial on the following grounds: (1st), newly discovered evidence; (2d), error in the rulings of the Court, upon the admission of testimony on the trial; (3d), that the finding of the jury, in answer to the 8th interrogatory, was against law and the evidence. The Court denied the motion, and the defendant appealed from the order denying the same, to this Court. The newly discovered evidence, the testimony admitted under objection on the trial complained of, the interrogatories for the jury, their findings thereon, and the testimony in regard to the matters in the eighth interrogatory, are all fully stated in the opinion of the Court.

Wilkinson & Woolfolk for Appellant.

F. H. Waite, and Brown & Wiswell for Respondents.

*By the Court*—Berry, J.—This controversy relates to certain portions of the town site of Mankato.

Upon the trial below, the Court, with the assistance of a jury upon specific issues submitted to them, found for the plaintiffs, and judgment was ordered accordingly. The defendant moved for a new trial. The motion was denied, and in this Court the defendant claims that this denial was erroneous.

1 Because improper evidence was admitted. This evidence was given by P. K. Johnson, who testified to statements (made upon the trial of another action) by a witness since deceased, tending to show that a certain quit claim deed covering the premises in dispute, and running from one Hoxie Rathbun, under whom the plaintiffs claim, to one Bunker, who

vol. xiii.—16

subsequently conveyed to the defendant, was fraudulently procured to be executed.

It is insisted that Johnson, swearing that there might have been some statements made by the deceased witness in regard to the procurement of the deed, which he did not remember, was improperly permitted to testify to the statements which he could recollect. Whether this objection to Johnson's testimony is well founded, or not, we do not deem it necessary to consider, or determine.

The quit claim deed was executed, as appears from the pleadings, in May, 1854, at which time the premises thereby quit claimed being unsurveyed United States land, Rathbun had nothing to convey, and the deed could have no effect. If he was occupying the land he was simply a trespasser upon the public domain. He was there not only without authority, but in violation of express provisions of the laws of the United States. He had no rights, estate, or interest to impart, or to lose through the operation of the deed of quit claim. As the deed was inoperative under any state of facts, it was entirely immaterial whether it was obtained by fraud or fair dealing. But it is contended that if the deed was inoperative, and the testimony relating to it immaterial, that inasmuch as the testimony was for that reason, if for no other, improperly admitted, a new trial should be granted. This, however, is not a matter of course. The object of a new trial is to afford a fair trial; and if the Court can see that there is no reasonable ground to apprehend that injustice was done by the reception of immaterial testimony, or to apprehend that the jury were misled by it to the substantial prejudice of the objecting party, a new trial should not be granted. Our statute recognizes this doctrine when it says in *Sec.* 235, *p.* 483, *Genl. Stat.*, that a new trial may be granted for any of the specified causes " *materially* affecting the *substantial*

rights of an *aggrieved* party." See also *Illingworth vs. Green-leaf,* 11 *Minn.,* 203; *Lowry vs. Harris,* 12 *Minn.,* 255; *Ames vs. 1st Div. St. P. & P. R. R. Co., Ib.,* 418; 2 *Graham & Waterman on New Trials,* 603 *et seq.; Ashley vs. Marshall,* 29 *N. Y.,* 403, *and cases cited; Barton vs. City Syracuse,* 37 *Barb.,* 300; *People vs. Gonzales,* 35 *N. Y.,* 59.

In the case at bar seventeen separate interrogatories were submitted to the jury. These interrogatories and the answers thereto were as follows:

1st. Was the deed executed by Hoxie Rathbun to Daniel T. Bunker fraudulently obtained by said Bunker?

Answer.—Yes.

2d. Did the defendant Maxfield purchase of said Daniel T. Bunker the premises therein described with the knowledge that said Hoxie Rathbun claimed that his sale to Bunker was fraudulent?

Answer.—He did.

3d. Did said Maxfield pay said Bunker any consideration for such purchase, and if so, when; and what was such consideration, and what was its value?

Answer.—Nothing was paid previous to the suit brought by Bunker against Maxfield and Thompson for the recovery of the amount of the notes, but the notes were subsequently settled to the satisfaction of the parties; but what amount was paid, the jury are unable to determine.

4th. Did said Hoxie Rathbun settle upon and occupy lot 3, section 7, town 108, range 26, and if so, when and how long did he occupy it, and when did he die?

Answer.—Yes, on or before the 12th day of June, 1853. He occupied it till the time of his death, which occurred on or about the 25th day of December, 1856.

5th. Did the family of said Rathbun occupy such lot after his death, and if so, how long?

Answer.—They did until the frame house was burned in 1863.

6th.   Did the defendant Maxfield settle upon said lot 3, and if so, when and how long did he occupy ?

Answer.—He did, in the month of February, 1855, and has occupied up to the present time.

7th.   Was the entry upon and occupancy of lot 3, in section 7, town 108, range 26, by Hoxie Rathbun, for and on behalf of the so called " Old Mankato Company," upon an agreement to hold the same for them ?

Answer.—It was.

8th.   If he did settle in behalf of the " Old Mankato Company," did he subsequently abandon such settlement, and set up a settlement for himself adverse to such company, and if so, when ?

Answer.—Yes, on or about the first day of September, 1853.

9th.   Did the defendant Maxfield know, before he paid said Daniel T. Bunker any consideration for the deed of the premises therein described, that said Hoxie Rathbun claimed that his sale to said Bunker was fraudulent ?

Answer.—He did.

10th.   Did said Hoxie Rathbun notify any member of the old company that he had set up a settlement for himself, and adverse to the old company, and if so, when ?

Answer.—He did.   He notified Hinkley on or about the first of September, 1853.

11th.   Did said defendant Maxfield have knowledge that said Hoxie Rathbun claimed to hold the land for himself, and when did he have such knowledge ?

Answer.—He did, between the sixth day of October and the first day of November, 1853.

12th.   Did the said Maxfield, at any time subsequently to

his alleged settlement on the premises in dispute, make a preemption claim, or claims, to other lands, and if so, when?

Answer.—No.

13th.   Did said Rathbun ever receive any payment, in whole or in part, of the consideration for said lands, and if so, how much, and did he ever pay or tender the same back?

Answer.—He did.   The amount is unknown to this jury, but the sum is less than fifty dollars.   No, he never paid or offered to pay anything back.

14th.   If the said Rathbun received any such payment, did he receive it knowing, or understanding the contents or provisions of the note, or instrument in writing given him by Bunker on the alleged purchase of the claim by Bunker, of Rathbun?

Answer.—No, he did not understand the contents of the note.

15th.   If the said Hoxie Rathbun set up any claim on his own account, to the premises in dispute, after his entry thereon, and before his widow filed thereon, with the Judge, as a part of the town site, did he claim the same as an agricultural claim under the pre-emption law?

Answer.—He did.

16th.   If said Maxfield made a claim to said land before he filed on the same, with the Judge, as a part of the town site, did he claim the same as an agricultural claim under the pre-emption law?

Answer.—He did.

17th.   Did the said Hoxie Rathbun, at any time after he went on the land in dispute, make a pre-emption claim, or claims, to other lands, and if so, when?

Answer.—He did make a claim on the 19th day of May, 1856.

Of these, it will be seen, that the 1st, 2d, 3d, 9th, 13th and

14th, had some relation to the quit claim deed, and in the view which we have expressed in reference to the deed, it will also be seen that these six interrogatories, and their answers, were altogether immaterial.

Now assuming that the remaining eleven interrogatories with their answers were material and pertinent, upon which one of them is it reasonably possible that the testimony in regard to the deed could have influenced the minds of the jury? Unless there is some positive evidence of passion, prejudice or corruption, a jury must be presumed to have acted with integrity and ordinary common sense. Certainly there is nothing in the testimony in regard to the deed, which had any bearing on the eleven interrogatories last mentioned, or which could furnish any aid in their solution.

We cannot presume, nor suspect, that the testimony relating to the deed did exercise any influence upon, or mislead the jury in answering these eleven interrogatories, and we are therefore of opinion, that the reception of this testimony is not a ground for a new trial.

II.—It is again urged that "from the affidavits of the defendant Maxfield and Branson, the Court should have granted a new trial, upon the ground of newly discovered evidence." As appears from the affidavits, the proposed testimony of Branson, which was the newly discovered evidence, would tend, at most, only to prove that the deed before spoken of was fairly obtained. It, of course, follows from what we have already said, that such testimony would be quite immaterial, and its new discovery could furnish no reason for a new trial.

III.—It is further claimed that the motion should have been granted, because "the finding of the jury on the 8th interrogatory, was against the law, and the evidence given in the case. The jury found, upon the 7th interrogatory, that the

original entry upon, and occupancy of the premises in dispute, by Rathbun, was made for and on behalf of the Mankato Company, under an agreement to hold the same for such company. This established the relation of landlord and tenant between the company and Rathbun. This at the time being government land, Rathbun, having settled upon the land as the agent of a third party, could not set up such settlement in support of a subsequent claim to hold the same premises as the *bona fide* occupant thereof." Admitting the view most favorable to the defendant, and all that he appears to claim, namely, that the arrangement between the Mankato Company and Rathbun created the relation of landlord and tenant between them, we are of opinion that the inference drawn is unwarranted.

The familiar rule by which a tenant is estopped to deny his landlord a title, is a rule of public policy, resting upon the idea that it would be bad faith to permit a tenant to repudiate a title, " by acknowledging and acting under which, he originally obtained, and has been permitted to hold possession of the premises." 1 *Washburn, Real Prop.*, 357 ; 2 *Sm. Leading Cases*, 657. The reason upon which this rule of estoppel depends is manifestly wanting, when a stranger, not the landlord, nor a privy of the landlord, seeks to set it up. And it is laid down by the authorities as a general rule, that a stranger cannot set up an estoppel ; that estoppels must be mutual, and can operate only between parties and privies.

Whatever the agreement or relation between the Mankato Company and Rathbun was, is of no concern to Maxfield. He had nothing to do with it, and derives no rights from either party. 2 *Sm. Lead. Cases*, 6th *Am. Ed.*, 661 ; *Ib.*, 716.

Rathbun, then, is not precluded by the agreement between himself and the Mankato Company, from setting up and claiming a settlement and occupancy on his own behalf, as against Maxfield.

We think further, that there was evidence presented to the jury tending to show an abandonment of the original settlement made by Rathbun for the company, and of a settlement for himself. The testimony shows that Rathbun built a log house on the premises for himself, and occupied it with his family; that he was in the occupation thereof at the time of, and after the government survey, and until his decease; that he notified Hinkley, Johnson and Leech, three members of the company, that he claimed the land for himself; that he repeatedly, while in possession of the disputed premises, between the summer of 1853, and the spring of 1856, both before and after the survey, claimed that he occupied in his own right, and that he filed a declaratory statement in the proper land office, thereby making an agricultural claim to the land.

We believe that the foregoing disposes of all the points made by the defendant. We think none of them are tenable, and the order denying a new trial is affirmed.