THE PEOPLE, Plaintiffs in Error, v. JOSE GONZALEZ T. FER-
NANDEZ, Defendant in Error.

It is not erroneous, on the trial of one who was last seen with a murdered man
a few moments before the homicide, to admit proof, by those who arrested
him, that they found his clothing stained with blood.

Such stains upon the person and clothing of the accused are among the ordinary
*indicia* of homicide; and the practice of identifying them by circumstantial
evidence, and by the inspection of witnesses and jurors, has the sanction of
immemorial usage in all criminal tribunals.

Matters of common observation may ordinarily be proved by those who witness
them, without resorting to scientific or mechanical tests, to verify them with
definite precision.

The testimony of the chemist who has analyzed blood, and that of the observer
who has merely recognized it, belong to the same legal grade of original and
primary evidence; and though one may be entitled to greater weight than the
other with the jury, the exclusion of either would be illegal.

Each party is at liberty to offer such proof as he has at his command; and if
it be admissible in its nature and relevant to the issue, it cannot be rejected
on the ground that, by greater diligence, it might have been made more satis-
factory and conclusive.

The clothes, identified as those worn by the accused on the evening of the
homicide, were properly submitted to the inspection of the jury.

Nothing legitimately connected with the *res gesta* of the crime should be excluded
from the consideration of the jury, whether its tendency be to inculpate or to
exonerate the party accused.

The intendment is, that an error of the judge, whether in the admission of evi-
dence or in his instructions to the jury, was prejudicial to the party objecting;
but when the record conclusively repels the intendment, there is no ground
for reversal by an appellate tribunal.

When improper testimony has been admitted, but the fact which it tended to
prove is independently established, by undisputed and competent evidence,
and where it appears, beyond the possibility of rational doubt, that the error
complained of did not and could not affect the result, nor work any injury or
injustice to the party objecting, the court has no authority to reverse the
judgment on that ground.

THE defendant in error was indicted, jointly with one Sal-
vador, otherwise known as Pellicier, for the murder of Jose
Garcia Otero, in the city of Brooklyn, on the 16th of November
last.   They were separately tried before Mr. Justice GILBERT
at the Kings County Oyer and Terminer in January last, and
both were convicted of murder in the first degree.

The convictions were reversed and new trials ordered at the March General Term in the second district, the majority of the court being of opinion that the judge erred, in admitting proof that the clothing worn by the prisoners on the night of the murder, was found, at the time of their arrest, to be marked with spots which had the appearance of stains of blood; and in permitting the clothes thus stained to be inspected by the jury.

On the trial of Gonzalez, it was proved, among other things, that the gloves worn by Pellicier, and left when the murderers fled, were found near the body of Otero, and that one of them was cut and bloody. On the following morning Gonzalez and Pellicier purchased new clothing and changed their apparel.

Anthon, one of the policemen who arrested Gonzalez, in answer to a question as to the identity of a pair of drawers produced on the trial, said he thought those were the drawers; that he noticed a mark of blood on them when he found them. The counsel for the prisoner objected to the expression, "a mark of blood," and excepted to the refusal of the court to strike it out. In reply to a question, on his cross-examination, he said, "I noticed a spot of blood on them, and these are the ones."

Waddy, another of the officers who made the arrest, testified to the identity of the coat, pants, vest, shirt and drawers, which were found in the prisoner's room; and he was asked: "Did you notice any spots on these clothes?" Objected to; objection overruled. Ans.: "Yes, sir." Ques.: "You say you found stains?" Ans.: "Yes, sir; stains on the coat, vest, pants, drawers, and shirt. There is one of the stains on the pants that I have reference to, and there is the one on the waist. The spots on this light coat are nearly off. The spots on the right sleeve I don't see. The spots that were on the coat are rubbed off." Ques.: "Examine the drawers?" Ans.: "I examined the morning I brought them down there, and they are also rubbed off." Ques.: "Look at the shirt?" "There, on the end of the waist of the shirt, is a spot." Objected to on the ground that there is no evidence that the shirt belonged to the prisoner; objection overruled and excep-

tion.  *Counsel for the prisoner :*  " The court understands that all this testimony, as to the character of these stains, is taken subject to our exception ?"  *The court :*  " No, sir."  *Counsel :* " We excepted in the case of the witness Ashton, and we have excepted here.  The character of stains can only be determined by scientific analysis and the testimony of an expert." *The court :*  " We do not understand that there is an exception to the testimony of this witness on this subject ; and, if counsel desire that point, they must move to strike that portion of the testimony out.'  " *Counsel for prisoner* then moved to strike out all the testimony as to the stains on the clothes." *District Attorney :*  " I do not object."  The motion was granted.  The district attorney then offered to show the jury the clothes and stains.  Objected to ; objection overruled, and exception.  They were then submitted to the jury.

The clothes had been found in the room of the prisoner at the time of his arrest, and were pointed out as his by the landlady.  They corresponded with the description, by other witnesses, of the clothes worn by him previous to and on the evening of the murder.  It was afterwards proved that the shirt was that of Pellicier, who returned with Gonzalez from Brooklyn, slept with him the night of the murder, and wore a new shirt when he returned the next day to his own lodgings.  Waddy was afterwards cross-examined by the counsel for the prisoner as to " *the blood spots,*" and a witness was called for the defense by whom an attempt was made to show, that several days before the murder a fight occurred between other parties, in which a glass was broken, which he stooped to pick up, and which might have cut his thumb.

Other exceptions were taken in the course of the trial, not material to be stated, as they were deemed frivolous by the court.

The material facts are sufficiently stated in the opinion.

*John H. Reynolds* and *S. D. Morris,* for the plaintiff in error.

*A. McCue* and *W. C. De Witt,* for the defendant in error.

PORTER, J. A general view of the facts disclosed by the other evidence in the case, will aid us in determining the question whether the stained clothes of the prisoner were properly submitted to the jury for inspection.

On the 13th of November last, Otero and Gonzalez arrived at New York, having taken passage from Havana in the same ship. No account is given of either, from the time of their arrival, until Wednesday, the 15th of November, at noon, when they presented themselves as guests at the Barcelona Hotel, in Great Jones street, which was known as a Spanish house. The appearance and bearing of the parties were such that Otero was at once furnished with a room, and Gonzalez was promptly refused admission, by the proprietor as well as the clerk. He was afterwards received, however, Otero interceding in his behalf, and describing him as a poor fellow who had come to New York for employment, and whom he was going to help. Gonzalez was without baggage, and confessedly without money, until the night of the murder, which occurred on the evening of Wednesday, the 22d of November. The prisoner had won the friendly interest of Otero in the course of their voyage from Cuba, where they were thrown together, as there were but four Spaniards among the passengers.

At the Barcelona Hotel he watched the movements of Otero with the keenest vigilance, accompanied him when he made his purchases, kept himself informed as to his whereabouts, and was recognized on the footing of an attendant or companion. Otero was young, frank, good-natured and self-reliant. From time to time, as he had occasion, he exhibited considerable sums in gold, which he continued to carry about his person, though cautioned by the clerk, in the presence of the prisoner, to deposit his money in the hotel safe.

Within an hour after their arrival at the Barcelona Hotel, Gonzalez had an interview with Pellicier, another Spaniard, who was afterwards indicted under the name of Salvador, as the confederate of the prisoner in the murder. The interview took place at the Hotel de Cuba, in Bleecker street, a little more than a block from Great Jones street, in a room

jointly occupied by Pellicier and Viela; both of whom seem to have arrived within a few months from Havana; and who, by an opportune coincidence, had become room-mates at that boarding-house the day before Otero and Gonzalez landed. Both had formerly been waiters at the Barcelona Hotel, and neither of them had any apparent means or employment.

Soon after his arrival Otero left for Philadelphia, and he did not return to New York until eleven o'clock the following Tuesday, being the day preceding that of the murder. During his absence, the attention of the proprietor and of the head clerk of the Barcelona was attracted by the restless disquietude of the prisoner, and the frequency of his inquiries why Otero did not return. On Sunday it was observed that he questioned them on the subject, at the office, five times in the course of the day.

Gonzalez had been for three days an inmate of the house before he gave his name to the book-keeper. The impression he made was so unfavorable, that the chief clerk thought proper to present his bill. He replied that he had not a cent, but Otero would pay it on his return. He was awaiting Otero when he arrived, and expressed great delight at seeing him again. On Wednesday he accompanied him when he was making his purchases, which were quite considerable in amount, and were to be paid for when the articles should be delivered. In the afternoon they returned to the hotel, and the clerk presented Otero's bill as they were about going in to dinner. This was at six o'clock, some three or four hours before the murder. Otero paid it in the presence of Gonzalez, and in doing so exhibited two handsfull of gold. It was this which led Mr. Samsony, the clerk, to caution him about carrying so much money on his person. He paid no heed to the warning, but went in to dinner. As he made no offer to pay the bill of Gonzalez, the latter was called back by Mr. Samsony, who said, "I want you to pay your bill." He replied, "To-night I shall have some money." After dinner Otero and Gonzalez went out together, and neither of them ever returned. At midnight, the room of the latter was found locked and empty.

It may be well here to recur to other intermediate occurrences disclosed by the evidence. On the Saturday previous, Pellicier told Edward Faw, a Spaniard whom he and Viela permitted to sleep on the floor of their room, that he intended to ship for Janeiro. On the morning of Sunday, the 19th of November, Pellicier and Viela breakfasted together at the Barcelona Hotel, and after breakfast there was a conference between Pellicier and Gonzalez. Viela claims that this was the first time he had seen the latter, and that he was not privy to their interview, though he often saw Gonzalez afterward. On Monday morning, at seven o'clock, the prisoner and Pellicier had an interview at room No. 17, at the Hotel de Cuba, and another at the same place in the evening. On Tuesday, the day of Otero's return, they had another conference at Pellicier's room. On Wednesday morning they met there again between seven and eight o'clock, and after their interview, Gonzalez engaged room No. 17 of the hostess, Pellicier and Viela having opportunely vacated it that morning, by exchanging it for room 34, which contained only a single bed. He told her he was going to occupy it immediately, and wished to retain the key, as he desired to bring his trunk at once. He had no trunk, and none was ever brought. The only use he ever made of the room was, to have a private interview in it with Pellicier at noon. Viela had shaved that morning in room No. 34, and left his razors in his trunk. He professes not to have missed them until the following morning. It appears, however, that between seven and half-past seven o'clock that evening, he and Pellicier went up together to their room. They found it locked, and Viela went down and sent up Edward Faw with the key. Faw testifies that Viela directed him to tell Pellicier to take out *what he had told him,* and a letter, and to bring them down with him. He went up accordingly with the key, and when they went into the room Pellicier opened Viela's trunk and took out his razors. Faw was sent down stairs, the reason assigned being that they expected company. Soon after Pellicier came down, and Viela was there to meet him. It was then half-past seven, and they were joined at the door

by Otero and Gonzalez, the former being dressed in black, and the latter in the clothes which were identified on the trial and submitted to the inspection of the jury. Pellicier wore the gloves which were afterward found at the scene of the murder. Viela left the hotel with them, and all four took a Bleecker street car. The attention of the conductor was drawn to the party, and he exchanged some words with them in the Spanish language. He noticed their appearance and dress. Gonzalez was smoking as they stood on the platform, and offered him a cigar. The conductor remarked the fact that Gonzalez, who had paid the fare of the party, permitted Otero to pay it again. He also observed that Viela disappeared before the car arrived at the Brooklyn ferry, where the others left. The proof is, that Viela did not rejoin the party, whether he was or was not an accomplice in the crime.

Otero accompanied Gonzalez and Pellicier to the Evans House, in Brooklyn, within a block of the City Park, where they arrived before 8 o'clock. There they plied him with liquor, and before they left he had taken from six to nine glasses of whiskey. One of them disappeared from the room for a time, but returned again; and it is evident, from what afterward transpired, that the purpose was to reconnoiter the scene of the proposed murder. Pellicier, who spoke English, ordered the liquor and paid for it. They all attracted attention — Otero by his portly appearance and manly bearing, and the others by their suspicious deportment and their seeming desire to avoid observation.

They left together at about half-past 9 o'clock. At the same time, as it happened, William C. Mills, of Brooklyn, left his shop in Fulton street, to go to his residence in Cannon Place. Near the center of the park he discovered the body of Otero, warm and bleeding, but motionless. The authorities were notified, and the police repaired at once to the spot. The assassins had evidently been interrupted by the approach of Mills, as they had not yet completed the work of rifling the corpse. One of the pockets of Otero was turned inside out, but another was left undisturbed, though it contained

over two hundred dollars in gold, and the receipt for his bill at the Barcelona Hotel, by which he was identified at once.

In the haste of their flight, the murderers had dropped their implements. The officers found near the corpse a bent dagger, a sheath, the detached parts of the razors which Pellicier had taken about two hours before from Viela's trunk, and his bloody gloves, the cuts in which were afterward found to correspond with the razor cuts on the fingers of his left hand.

Otero was an athletic and vigorous man, but he was evidently surprised and overpowered at once. He received twenty-five wounds, the most deadly being those from behind with the dagger, one of which pierced the backbone and severed the spinal cord, while others penetrated and fractured the base of the skull. It is quite apparent, from the attendant circumstances, that Pellicier clutched him with his left hand as he was plying his dagger from behind, and that Gonzalez, who was the bolder ruffian, while gashing Otero in front with the razor, cut the gloved hand of his confederate by inadvertence.

Neither of the murderers returned to their lodgings; but about an hour after the commission of the crime, they made their appearance, without luggage, at a German boarding house in Centre street, New York, where they engaged a room together for the night. Gonzalez, who, at six o'clock, claimed to be penniless, paid five dollars in advance for a week's board. He was a stranger to the house, but Pellicier had boarded there before going to the Hotel de Cuba, and his trunk had been left in a building in the rear. They called on the hostess for brandy and sugar, which her son took to their room. The mother and son both noticed that Gonzalez had a mustache when he came at night, and that it was gone the following morning. The boy observed that Pellicier's hand was cut and wound with a rag; and he overheard them in animated conversation during the night, in a language which he did not understand. In the morning both of them went out early, and though they returned at half-past ten, they did not breakfast until twelve. The

inmates of the house observed that Gonzalez, who wore a hat and gray coat when he came, had changed them for a cap and a new suit of clothes. It was proved that while they were out they were making purchases of clothing in the Bowery, for which Gonzalez paid in gold. Pellicier left his stained shirt in Gonzalez' room, where it was found when the latter was arrested. When they separated after breakfast, Pellicier went to the Hotel de Cuba, and Mrs. Flores, the proprietor, noticed that he had on a pair of woolen gloves instead of the kid gloves he had worn before, and a new hat, shirt and necktie. He was arrested later in the day for the murder. At the station-house he was requested to put on the gloves found by the body of Otero. He was compelled to comply, though he denied that they were his, and strenuously objected to the test. It was thus found, on examination by the physicians, that there was a perfect correspondence between the cuts in the gloves and those on Pellicier's fingers.

On the same day, Gonzalez was pointed out to one of the police by Mr. Bromme, the proprietor of the boarding house in which he lodged; but confident in his disguise, and not aware that he was under surveillance, he remained there until Saturday, when he was arrested. There were no other Spaniards stopping at the house, and he appeared to be lonesome and discontented, and from day to day shifted his room. He treated the German boarders to liquor, though he did not understand their language, and he took occasion to exhibit to Mr. and Mrs. Bromme a roll of gold pieces, intimating that this was the kind of money they liked in Spain. When arrested, he made an unavailing attempt to escape. He had on his person $36 in bills and $45 in gold. On searching the clothes he wore, a hole was observed on the inside of his coat collar, and two drafts belonging to Otero were found concealed beneath the lining. He was afterward asked by Mr. Cuyas how he came by these drafts, and replied that Otero gave them to him to take care of them.

The controlling facts, of which the foregoing is a brief summary, were established by the clearest evidence, and

TIFFANY—VOL. VIII.    8

there was no pretense of any rational explanation consistent with the innocence of the prisoner. The only question left in doubt on the proof was, whether Viela was a confederate of Gonzalez and Pellicier in the preliminary arrangements for the murder. It is possible that he was merely their dupe. If he was an accomplice, it is fortunate for him that his audacity failed in time to save him from the halter. His relation to the transaction, whichever may have been its character, tends to explain the unsatisfactory nature of his testimony, and its inconsistency with that of more reliable witnesses. Under the circumstances, it was, perhaps, the duty of the district attorney to call him; but if his evidence was struck from the case, the proof of the defendant's guilt would be none the less overwhelming.

The material facts were proved by a great variety of witnesses, coming from different walks in life, and having no opportunity for concert and no community of interest. All, with the exception of Viela, gave their testimony with evident frankness, intelligence and candor. The circumstances preceding the crime, as well as those which attended and followed it, all point with fatal certainty to Pellicier and Gonzalez as the murderers. The character of the two confederates, the motives which tempted them to the crime, the meetings at which it was pre-arranged, the opportunity sought for its commission, the devices to insnare the victim, the precautions to evade detection, the weapons employed, the place selected, the hasty flight, the resort to a house of refuge, the acquisition of gold at night, the change of apparel in the morning, the futile attempts at disguise, the drafts concealed on the person of Gonzalez, the gashed fingers and bloody glove of Pellicier, all reveal unmistakably the guilt of the two parties last seen with Otero but a few moments before his death, and within two blocks of the spot where they murdered him. In the light of this evidence, undisputed and unexplained, the crime they committed in darkness is as clearly open to view as if they had perpetrated it in the blaze of noonday. The track of the culprits is laid bare from their first interview at the Hotel de Cuba down to their

conference in the jail cells as prisoners. The case furnishes a signal illustration of the searching nature and the irresistible force of circumstantial evidence in the detection and exposure of secret guilt. So far as human sagacity could foresee, the perpetrators of the crime were secure of absolute immunity. They had no thought, when they were compassing Otero's death, that they were lifting their hands against their own lives; but step by step, as they were dogging him, retribution was following unseen, close upon the heels of the criminals.

The circumstances which were established by evidence confessedly competent were so conclusive as to the guilt of the prisoner, that no honest jury could refuse to convict him of the crime. To acquit him, would be to shield guilt from justice, and deny the protection of law to the innocent. If, therefore, the court below was right in holding that the judge erred in admitting additional evidence tending to the same conclusion, we think it was clearly wrong in reversing the conviction; for, upon the facts disclosed, the supposed error could work no legal injury to the prisoner. As it was shown, beyond all question, by undisputed and competent proof, that the accused was one of the murderers, we are under no legal or moral obligation to assume that the jury might have rendered a false verdict of acquittal, but for the erroneous admission of other and needless evidence. In this respect, there is no distinction between civil and criminal cases. The reception of illegal evidence is presumptively injurious to the party objecting to its admission; but where the presumption is repelled, and it clearly appears, on examination of the whole record, beyond the possibility of rational doubt, that the result would have been the same if the objectionable proof had been rejected, the error furnishes no ground for reversal. Many of the earlier cases in this State favored a departure from the English rule on this subject, and maintained that it was impossible to determine whether the evidence improperly received might not have had a controlling influence upon the jury. (*Marquand* v. *Webb*, 16 Johns., 89; *Osgood* v. *Manhattan Company*, 3 Cow., 621; *Clark* v.

*Vorce*, 19 Wend., 232; *The People* v. *Wiley*, 3 Hill, 214.) The later decisions have modified this doctrine, in harmony with the general current of English and American authority, and we think they rest upon sound principles. The intend-ment is, that an error of the judge, whether in the admission of evidence or in his instructions to the jury, was prejudicial to the party; but there is no more difficulty in the one case than in the other, in determining, upon the whole record, whether, in the particular case, such intendment is repelled. Where, as in the present case, it is apparent and obvious that the supposed error did not and could not affect the result, nor work either injury or injustice to the party accused, we think it does not call for a reversal of the conviction. (*Shorter* v. *The People*, 2 N. Y., 193; *City Bank of Brooklyn* v. *Dearborn*, 20 id., 246; *Forrest* v. *Forrest*, 25 id., 510; *Smith* v. *Paton*, 31 id., 66; *The State* v. *Ford*, 3 Strob., 517; *The King* v. *Ball*, Russell & Ryan's Cr. C., 132; *The King* v. *Tinkler*, 1 East P. C., 384; *Horford* v. *Wilson*, 1 Taunt., 12; *Doe* v. *Tyler*, 6 Bing., 561; *Rutzen* v. *Farr*, 4 Adol. & Ellis, 53; *Wright* v. *Doe*, 7 id., 289; *Nathan* v. *Buckley*, 2 Moore, 153; *Stiles* v. *Tilford*, 10 Wend., 339; *Page* v. *Ellsworth*, 44 Barb., 640.; *The People* v. *McCann*, 16 N. Y., 61; *Marcly* v. *Shultz*, 29 id., 356; *The People* v. *Bransby*, 32 id., 525.)

But we are of opinion that there was no error in permitting witnesses, who were not chemists, to prove that the clothes worn by the accused on the night of the murder, and produced for inspection on the trial, were marked with stains apparently produced by blood, when found in the possession of Gonzalez at the time of his arrest. A portion of this evidence, if not the whole, was struck out after it was received, on the application of the prisoner; but it is claimed by his counsel, and we think it fair to assume, that the motion applied only to the testimony on this subject given by the witness Waddy.

It is not denied that the fact, if true, was relevant to the issue, but it is claimed that it did not admit of proof except by chemical analysis. In this we cannot concur. Stains of

blood, found upon the person or clothing of the party accused, have always been recognized among the ordinary *indicia* of homicide. The practice of identifying them by circumstantial evidence, and by the inspection of witnesses and jurors, has the sanction of immemorial usage in all criminal tribunals. Proof of the character and appearance of the stains by those who saw them has always been regarded by the courts as primary and legitimate evidence. It is in its nature original proof, and in no sense secondary in its character. The degree of force to which it is entitled may depend upon a variety of circumstances, to be considered and weighed by the jury in each particular case; but its competency is too well settled to be questioned in a court of law. Science has added new sources of primary evidence, but it has not displaced those which previously existed. The testimony of the chemist who has analyzed blood, and that of the observer who has merely recognized it, belong to the same legal grade of evidence; and though the one may be entitled to much greater weight than the other with the jury, the exclusion of either would be illegal. Each party is at liberty to offer such proof as he can, and if it be admissible in its nature and relevant to the issue, it cannot be rejected on the ground that, by greater diligence, it might have been made more satisfactory and conclusive. Either party in the present case had the right to resort to microscopic or chemical tests, but neither was bound to do it, and neither can complain of the other for the omission. The doctrine on this subject is well stated by Greenleaf: "In requiring the production of the best evidence applicable to each particular fact, it is meant that no evidence shall be received which is merely *substitutionary* in its nature, so long as the original evidence can be had. The rule excludes only that evidence which itself indicates the existence of more original sources of information. But where there is no substitution of evidence, but only a selection of weaker instead of stronger proofs, or an omission to supply all the proofs capable of being produced, the rule is not infringed." (1 Greenl. Ev., § 82.)

Blood stains on garments occur so frequently in the experience of all, from a great variety of causes, that they are easily recognized by persons of ordinary observation. We all know that, when recently made, they are as readily discernible as spots produced by paint or oil. In the one case, as in the other, the observer may be deceived by appearances; and the error may be detected by more rigid scrutiny, by microscopic examination, or by elaborate chemical analysis, just as the mistakes frequently made by witnesses, in the estimate of distance and dimensions, are ascertained and rectified by means of the measuring line.

Matters of common observation may ordinarily be proved by those who witness them, without resorting to mechanical or scientific tests to verify them with definite precision. (*Campbell* v. *The State*, 21 Alabama, 40, 44; *Crane* v. *Town of Northfield*, 33 Vermont, 124; *People* v. *Eastwood*, 4 Kern., 562, 566.) The affairs of life are too pressing and manifold to have everything reduced to absolute certainty, even in the administration of justice. Some reliance must be placed in the intelligence and good faith of witnesses, and the judgment and discrimination of jurors. Microscopes, chemists and men of science are not always at hand; and criminals are neither anxious to court observation, nor careful to preserve the evidences of their guilt. The apparel worn and the implements used in the commission of crime are often destroyed or concealed as soon as a convenient opportunity occurs, and they must be described, if described at all, as they were seen by the witnesses.

It is not true, as a rule of law, that evidence is incompetent merely because it is inconclusive. It is ordinarily admissible, if the fact sought to be proved is itself relevant to the issue, and if the proposed proof legitimately tends to establish it. Absolute precision and certainty are not always attainable in matters resting, not on personal knowledge, but on the force of human testimony. Even chemical tests are fallible. The expert sometimes proves unskilled or negligent; and he may be biased or suborned. The fact, for instance, that arsenic was administered to one who suddenly

died, may be established by circumstantial evidence, even against the oath of the examining chemist. No jury would be bound by his testimony, if it was established to their entire satisfaction, by independent and credible witnesses, that the party accused had recently and repeatedly threatened to poison the person to whom he administered it; that he purchased, on the same day, a package sold and labeled as arsenic; that he stealthily introduced part of the contents into the food of the party; that it had the precise appearance and was followed by the usual effects of arsenic; that a substance of like appearance was found in the stomach on *post mortem* examination; that a portion of it was given to a dog, with fatal effect, while another portion was handed to a chemist for analysis; that the party suspected fled; that, on his arrest, the residue of the broken package was found on his person, and that, on being given to other animals, it was followed, as in the case of the deceased, by retchings, convulsions and speedy death. So, in the present case, though the guilt of the prisoner was established by irresistible proof, irrespective of the stains upon his garments, such stains, corresponding in appearance with those caused by blood, were specially significant in view of other facts disclosed by the evidence. That they were thus produced, was matter of legitimate inference from the undisputed facts, that they were found on the clothes of those who left the Evans House with Otero immediately before his assassination; that neither of the accused ventured to return that night to their own lodgings; that they purchased other clothes and discarded these at an early hour on the following morning, and that similar stains were found on the gloves of Pellicier left on the ground in the haste of sudden flight. All the surrounding circumstances tend to the clear conclusion, not merely that the stains exhibited to the jury were made by human blood, but that they were made by the blood of Otero, a fact which no chemical skill could reveal. The proof was cumulative and needless for the purpose of conviction, but it was in perfect accord with the other circumstances of the case, all pointing to these men as the murderers.

The clothes, having been identified as those worn by the accused at the time the crime was committed, were properly submitted to the jury for inspection. The exhibition of the articles in the condition in which they were found, was more satisfactory, in connection with the other circumstances, than any description of them that could have been given by the witnesses. It is said by Starkie, in relation to evidence of this nature, that "upon the trial of a prisoner on a charge of homicide or burglary, all circumstances connected with the state of the body found, or house pillaged, the tracing by stains, marks or impressions, the finding of instruments of violence or property, either on the spot or elsewhere — in short, all visible *vestigia*, as part of the transaction, are admitted in evidence for the purpose of connecting the prisoner with the act. Such facts and circumstances have not improperly been termed inanimate witnesses." (1 Starkie Ev., 66.) Our laws are not specially framed to shield guilt from detection. They exclude nothing legitimately connected with the *res gesta* of crime. In cases of this nature, such proof is uniformly received, and it is equally admissible whether it tends to inculpate or exonerate the party accused. (1 Greenl. Ev., § 108; *Campbell* v. *The State*, 21 Ala., 40, 44; *People* v. *Larned*, 3 Seld., 445, 452.)

We have considered the questions arising on other exceptions taken in the course of the trial, and we find in them no ground for questioning the correctness of the rulings made by the judge. The prisoner was fairly tried and ably defended. His guilt was clear and his conviction just.

The judgment of the Supreme Court should be reversed, and that of the Court of Oyer and Terminer should be affirmed, and the proceedings should be remitted to the Supreme Court, to the end that it may direct the sentence to be executed according to law.

MORGAN, J., also delivered an opinion reaching the same conclusion.

All the judges concurring,
Judgment affirmed.