ARMSBY *et al.*, plaintiffs in error, v. PEOPLE.

*Criminal law — trial — persons jointly indicted — qualifications of juror — evidence.*

Where four were jointly indicted for felony, *held*, that three of those indicted had no right to require that the fourth should be tried jointly with them.

Upon a challenge to a juror for principal cause, it appeared that he had owned a farm ; had conveyed it away " last spring," and did not then own any real estate. He had taken back a mortgage, but could not tell, of his own knowledge, that he was assessed " this year " for any personal property. He had not been so assessed the preceding year, but had then been assessed for real estate. The trial took place in June. The court sustained the challenge. *Held*, no error.

Upon an issue as to the identity of the defendants with persons who had committed a larceny, it appeared, that while two of such defendants were under arrest, the complainant said that one of them was the man " who had scooped in his money," and the other was the man who had introduced a game of dice (during which the larceny was committed), and they made no reply. He then said, that another had represented himself as city attorney, and then both of the prisoners spoke up and said he was mistaken, and that that man was a stranger, who had just dropped in. Money had already been found on one of the prisoners, which corresponded somewhat with the money which had been taken from the complainant. This evidence was admitted by the court as against the two defendants, in whose presence it occurred. *Held*, that the evidence was admissible.

THIS is a writ of error to review a judgment and conviction of the Albany oyer and terminer. The plaintiffs in error were convicted of grand larceny. The indictment was also, jointly, against one James Mulhall, who has not been arrested, and James Palmer, *alias* Davis, not tried. The larceny charged, was the taking from the possession of one Job H. Reynolds, a stranger, who arrived in Albany, in April, 1873, about $300 in money, and a gold watch, of the value of about

$80. Three of those indicted were tried, convicted, and sentenced to the penitentiary, two for three years each; the other for two years. The testimony is voluminous. So much only as is material will appear in the opinion.

*R. W. Peckham,* for plaintiffs in error.

*N. C. Moak, District Attorney,* for people.

P. POTTER, J. The undisputed facts are, that the complainant, Reynolds, from Michigan, an elderly man, arrived in the city of Albany, in the afternoon, and toward evening, went to the steamboat *Drew,* purchased a ticket, and checked his baggage for New York. While sitting on board of the boat, a stranger made his acquaintance, and inquired the place of his residence, and being informed that it was Michigan, this stranger informed him, that a man from Michigan had been, that afternoon, killed on the railroad, and invited him to go down and see if he could not recognize him. They went together, along the dock of the river, as far as Maiden lane, and finding no dead man, this stranger then said, he guessed they had taken him away; and then invited Reynolds to go into a saloon, and have a glass of beer. The stranger treated him, and then he treated the stranger. While they were drinking, Kelly, one of the plaintiffs in error, came down stairs into the saloon, and Kelly and the stranger commenced throwing dice for beer; Armsby, with several *aliases* (whom we shall hereafter call Armsby), was the bar-tender of the saloon. While they were playing dice, Clune (with an *alias*), another indicted party, and Mulhall (who has escaped arrest), came in. Reynolds was invited to join in throwing dice; he protested, plead ignorance of the game, and it is not quite certain, whether or not, he joined in throwing dice. Mulhall claimed to be city attorney. Reynolds, about this time, began to think he was in a bad place; took out his money from a sack, inside his vest, to pay for his beer, and as he commenced to open it, Armsby seized it, and went to the end of the counter with it; and then the whole party, *five* of them, huddled together, around Armsby, at the end of the counter. These five were *Kelly, Armsby, Mulhall, Clune* and the stranger. The next that Reynolds observed, was that the stranger had slipped out; in half a minute, Kelly also slipped out. He (Reynolds) then found his watch was gone

also. He began (he says), to make a fuss, and they stepped up and said, if I would keep quiet they would get my money for me. Mulhall said, he would get my *watch* for me, if I would sign a paper. Mulhall said he was a city attorney, and Clune said he was a detective. He (Reynolds) signed a paper; is not certain what it was; was called a receipt. Kelly then gave Mulhall the watch, and Mulhall gave it to Reynolds. Clune then went with him to the steamboat, as he pretended, to search for the stranger, whom they did not find. Reynolds, seeing a policeman there, asked him if Clune was a detective, and he said no, and Reynolds then told the policeman to arrest him, and he did so. This policeman was officer "Deitz." Deitz then got another officer, " Sullivan," to help him. While Reynolds was at the boat, he also saw Mulhall, and told Deitz " there is another of them." Reynolds then went to the station-house, and there he found Clune, Kelly and Armsby, and recognized them to the police officers. On searching Armsby, the money of Reynolds was found and identified.

The theory of the prosecution is, that these three plaintiffs in error, with the other two indicted persons, were all conspiring, aiding and abetting in this larceny, and by a conspiracy of intent, and action, each performing his somewhat different part, as to time and place, but with one common design, participated in the commission of this larceny.

The plaintiffs in error rely chiefly upon errors occurring upon the trial, for a reversal of the conviction and judgment. These claimed errors are numerous; some of them are urged with great force, and are close questions of law, and in some of them, the criminal law of different States seem to be somewhat in conflict. We shall best dispose of them by examining them in their order.

1. One of the parties indicted was one Davis (*alias* Palmer), who, on a former day, had demanded a separate trial, and it was granted him. The trial then proceeded against the three plaintiffs in error, but the jury failed to agree. The trial was then again moved, and then the plaintiffs in error demanded that Davis should be tried with them, as his name was also included in the indictment. The district attorney thereupon moved that the defendant Davis have a separate trial. The court held, that the defendants, if they demanded it, might have separate trials; if they did not demand it, as the district attorney had moved that the three defendants, Clune, Armsby and Kelly, be tried separately from Davis, that such

motion was within the discretion of the court to grant. The court did grant it, and the counsel for the three defendants excepted. I think there was no error in this ruling. No such right, as was demanded, is secured by statute. The only regulation the statute has made, is that of 2 Revised Statutes, 735, § 20, as follows: " When two or more defendants shall be jointly indicted for any felony, any *one* defendant, requiring it, shall be tried *separately*. In all other cases, defendants, jointly indicted, shall be tried separately, or jointly, in the discretion of the court." This was not an application by one for a *separate* trial, but an application by *three* to have a *fourth* tried *jointly* with them. Prior to this statute, it was not even the right of *one* defendant to have a separate trial, but was matter of discretion with the court. *People* v. *Williams*, 19 Wend. 377; *Commonwealth* v. *Robinson*, 1 Gray, 560. This demand of the three was in violation of the statute right of one.

2. In impaneling the jury, one Perry, called as a juryman, was challenged by the defendants for principal cause. On being examined, it appears that he had been a farmer; had sold out his farm last spring, and had no title to any real estate at the time of his examination, and could not tell, of his own knowledge, that he was assessed *this* year for any personal property, was not assessed last year for any personal property, but was for real property. He gave a deed last spring, and took back the mortgage. The challenge was then withdrawn by the defendants, and renewed on the part of the people. The same evidence was repeated. The defendants then claimed that the juror was competent. The district attorney objected that the juror was not assessed for personal property. The court sustained the challenge, and the defendants excepted. There may be a little ambiguity in the meaning of the statute as to the competency of this juror. He was a competent juror when his name was selected by the town officers; not, as we must assume, because he was assessed for personal property, for he was not, but because he owned real estate of sufficient value for that purpose. When he sold this real estate, and until he acquired more, or, until he was assessed upon personal estate to the value of $250, he did not possess such qualifications as authorized the town officers to select him as a juror. 2 R. S. 411, § 13. But the question here is, having had his name once selected when he was qualified, and his name still remaining in the jury list, and in the box to be drawn from, is he *then* exempt or disqualified from serving? If he has personal prop-

Armsby v. People.

erty of the value of $250, and is not, *at the time,* assessed for it, he has not the qualification that constitutes him a juror to be selected by the town officers. If he does not possess these qualifications, and, notwithstanding his name is found in the box, and he is drawn as a juror, the statute then directs the court to discharge him from such service. 2 R. S. 415, § 33. The ambiguity arises between the 13th and 33d sections. Does the 33d section, then, make it imperative upon the court to discharge the juror if he is the *owner* of personal property of the value of $250? Thus it reads: "The court shall discharge any person from serving on a jury in the following cases: 1. When it shall satisfactorily appear that such person is not, at the time, the owner in his own right, or in the right of his wife, of a freehold estate in real property, situated within the county, of the value of $150, *and* is not the owner of personal property to the value of $250." *Shall* the court discharge when the juror does not thus possess *both* real and personal? or, should the court refuse to discharge if he possesses certain real or personal property to those amounts? What is the power of the conjunction *"and"* in this sentence? Is this 33d section to be read in connection with section 13, and so construed together, as that in section 33 the personal property therein mentioned must be *assessed* property? I admit there is some obscurity in the expression of intent.

Whatever may be the true construction of this statute, the decision of this case, I think, does not depend upon the ruling of the judge upon this point. The defendants had no such vested right in this juror as to make his rejection error. They were tried by twelve unobjectionable jurors — competent jurors — against neither of whom they urged any objection. It is unlike the case of being tried by one objectionable juror, who sat by reason of a ruling that he was competent. There can arise no intendment of error against the defendants when tried by a competent jury — no presumption that they have been prejudiced. It is obvious that the ruling, even if it is technically error, worked no injury or injustice to the defendants on the trial. *People* v. *Gonzales,* 35 N. Y. 60. I do not see that the act of 1873 (chap. 427) works any change in the former statute or in the common law in this regard. It merely changes the trier, and provides the manner of review.

3. The next point in the order of the case to which objection is raised, is the ruling of the court in the admission of evidence of the declaration of Reynolds, the complainant, in the presence of

two of the defendants, Kelly and Armsby, and the silence of the defendants as to what was said on the night of the larceny in question. After the arrest of Clune by direction of Reynolds, Reynolds was taken to the station-house, where Kelly and Armsby were also brought, under arrest. The district attorney asked Reynolds, on the trial, what the officers said to him and what he said to the officers about the money he had lost there in the presence of the defendants.

The defendants' counsel objected to this evidence, *first*, as incompetent and immaterial; and, *second*, upon the ground that it appears that the defendants were then under *arrest;* and to any thing as to the conduct of the defendants there at that time; and also, on the ground that it was the declarations of the witness. The testimony was offered as to Kelly and Armsby alone. The court admitted the evidence, and the defendants' counsel excepted. The same offer of testimony was repeated, referring to the same occasion, when two of the police officers were testifying at a later stage of the trial; the same objections were made, the same ruling had, and the same exceptions. The objections may all, really, be considered together as one point, and all, as involving the same legal question, be discussed together. This seems to be regarded as the main point in the case. The soundness of a ruling at a trial essentially depends upon the particular circumstances which appear, or which are given as the theory of the case. It frequently occurs that the admission of evidence is upon a theory, which, if not sustained, makes the testimony in the end improper, and demands its being subsequently stricken out, with proper instructions then to the jury in regard to it. So, too, it often occurs in practice, that testimony is admitted which is technically illegal at the time, but the illegality is cured during the trial by other evidence. The propriety of the testimony so admitted in this case, as in most others, must be determined by the surrounding circumstances. It appears that the complainant was a stranger in the city; had been beguiled by a stranger into a place of doubtful repute; had found there an association of men, acquaintances of each other, and had been robbed, by force, of his money and watch; and though they all seemed to be acquaintances and to know by whom and by what means he had been robbed, none volunteered to communicate to him the truth. Some quietly and secretly departed; others, acting with the false pretense of being of the police force, the one city attorney, another a detective, after the robbery, were luring him on, under the pretense of aiding him to find the thief. This was

the theory of the prosecution, under which the evidence was offered, and as it turned out, was the truth of the case. Suspecting the fraud, the complainant caused the counterfeit detective to be arrested, and gave such information as caused the arrest of two of the associates also. It was as to the occurrences at this period, at the station-house, in the presence of Kelly, who had had his watch, of Armsby, the bar-keeper, who had stolen his money, and of Clune, the pretended detective, that the following proposed inquiry related: "What was said by you about the money you had lost there in their presence?" Ans. "I told the officers who were there what amount of money I had lost" in their presence. "I said I had $300; and $50 was on a Baltimore bank, and I had four ($20) twenties, and four ($10) tens, and the rest in ($5) fives, and the $75 was in gold." At a later stage of the trial, one Doran, connected with the station-house, was examined as to the same occurrence at the station-house in the evening of the day of the larceny, at the time Kelly, Armsby, Palmer and Clune were present. To the question by the district attorney, "State what occurred there so far as Reynolds and the defendants were concerned? Confined to Armsby and Kelly. Ans. "They were brought into the station-house; Reynolds was in a chair, sitting there. I believe Reynolds was asked whether those were the parties. I believe he said Armsby or Brooks, which is the same man, was the man who had scooped his money in; and he said Kelly was the man who had introduced the game of dice; he said Palmer was the man who represented himself as city attorney." Q. "What then, about the money he had lost?" Ans. "They were searched; money was found on them, in all $295.05; it was in separate packages." * * Q. "What did he (Armsby) say about mixing the money?" Ans. "He said he did not want the money mixed; he said some of it was bar money, that was the lesser package; the larger one was wrapped in tissue paper." Q. "Did he say where the other came from?" Ans. "No; I do not think he did." * * * Q. "What reply did Armsby make when Reynolds said he was the man who scooped in his money?" Ans. "I do not know as he said any thing that I remember of." * * * Q. "What did Kelly say when Reynolds said he was the man who introduced the dice?" Ans. "I do not know as he said any thing that I can remember; not any thing that I know of."

Michael Ryan, a policeman, present at the same time as a witness, was asked the same questions, and his testimony is the same as that

of the preceding witness, in substance and effect. He added, "that on search, there was a $50 bill on a Baltimore bank; three or four $20, some $10, and the balance in $5 bills. Armsby did not want them mixed; that the smaller package was the bar money; the big one was wrapped up in tissue paper." Robert Davison, captain of the police force, and Barnett Gelan, a sergeant of the same force, were also sworn, and stated that they were present at the same interview at the station-house, and they testified to the same facts as the other witnesses with but slight variations, and with no conflict. Captain Davison, when testifying to the identification by Reynolds of Armsby, Kelly and Palmer, on the cross-examination by defendants' counsel, in answer to a question, testified as follows: Q. "Kelly and Armsby did say something to Reynolds about Palmer, when Reynolds said Palmer was the city attorney?" Ans. "Yes; they both said he was mistaken; *they* said *he* (Palmer) did not belong there; that *he* simply dropt in there." Ryan, the witness, also corroborates this testimony; he said, "they told the old man he was mistaken" (referring to his identifying Palmer as city attorney). To all this testimony, except that called out by himself, the defendants' counsel not only objected to its being given, for all the reasons stated by him when it was offered, but excepted to the rulings which admitted it, and also made a motion to strike out the evidence as to Armsby's silence when Reynolds charged him in the station-house with being the man who scooped in his money; which motion was denied, and to which denial there was an exception. Besides this, the defendants' counsel requested the judge to charge the jury that the fact that Armsby remained silent, when Reynolds pointed him out to the officer as the man who took or scooped in his money, furnishes no evidence against Armsby, and that the jury have no right, from that fact, to indulge in the least presumption against him. He also made the same request as to Kelly's silence, when Reynolds pointed out him as the man that introduced the game of dice. These requests the court severally refused to charge, and the counsel severally excepted.

This statement presents the whole legal question, as to whether silence can be given in evidence against a party charged with the commission of crime, or, as to his identity, in cases where identity is the material question; and if admissible, when, and under what circumstances. These questions we will consider.

There can be, I think, no unvarying rule, that can be applied to

all cases, under all circumstances. There are cases, where silent acquiescence of a party, in the statements of others, made respecting himself, made in his presence — statements injuriously affecting his rights or interests, will amount to an implied or presumptive admission of the truth of the statement. This is based upon the old maxim, "that he who is silent is supposed to consent." The case of *Jewett* v. *Banning*, 21 N. Y. 27, was an action for assault; the plaintiff charged the defendant with it, and he denied it. Three-fourths of an hour afterward, the plaintiff charged the defendant with it again, with some variations, in the presence of other witnesses, and he did not deny it. The judge submitted this question of silence to the jury, to give such weight to it as, under the circumstances, it might be entitled to. A judgment for the plaintiff was affirmed, and the charge held not to be error. In the case of *Fenno* v. *Weston*, 31 Vt. 345, it was held, that the omission of a party to reply to the *statements* in a letter, about which he has knowledge, and which, if not true, he would naturally deny, when he replies to other parts of the letter, is evidence tending to show that the statements so made and not denied are true. So if he wholly omits to answer such letter. Id. In *Coe* v. *Hutton*, 1 Serg. & Rawle, 398, it was held, that a *cash* account, shown to the defendant, and not objected to by him, was evidence, upon which the jury, under all the circumstances of the case, might decide. In *Vincent* v. *Huff*, 8 Serg. & Rawle, 388, it was held, that a party who paid another fifty pounds, and said at the time "*this is the amount of*" (T. a piece of land) "*it is mine now*," is evidence, if not contradicted, and affords ground of inference, that the whole purchase-money was paid. In *Jackson* v. *Winchester*, 2 Yeates, 529, on a motion of a defendant to be discharged on common bail, a witness swore to certain facts in the presence of the plaintiff. The witness died before trial. On the trial the defendant offered these facts so sworn to in evidence. The court held, that what the witness so swore to stood precisely on the same footing as declarations *in pais*, in the presence of the party, and where the plaintiff was silent, the maxim "*qui tacet consentire videtur*," is applicable, and the jury will judge of it, under all the circumstances of the case. The same rule in this regard is applied in criminal as in civil cases. 1 Phil. Ev. 390. The case of *Rex* v. *Smithies*, 5 Car. & P. 332, was an indictment for murder, by setting fire to a house. On the trial it was proposed to prove what the prisoner's

wife said to him on the subject of the fire, to which he gave no direct reply, or an evasive reply. This evidence, though objected to, was allowed by the court, as evidence of an implied admission. In a subsequent case of *Rex* v. *Bartlett,* 7 C. & P. 832, also a case of murder, while the prisoner was in custody at the time, or before his examination before the magistrate, the wife came in and said: " Oh, Bartlett, how could you do it." He looked steadfastly at her and said: " Ah, what! you accuse me of murder too." " I do, Bartlett, you are the man that shot my mother." The prisoner did not make any reply. She turned to the witness and said: " This is done for money." This evidence was permitted to go to the jury. See, also, *Jewett* v. *Banning,* 21 N. Y. 27. The elementary works on criminal law seem to have adopted this view of the practice as sound, and they have cited these same authorities as above to sustain them. See Roscoe's Crim. Ev. (3d Am. ed., by Sharswood) 56; Burrell on Circumstan. Ev. 482; Best on Presumptions, § 242 ; 2 Starkie's Ev. 26; 1 Phil. Ev. (3d ed.) 400; *People* v. *Green,* 1 Park. Cr. 17. My own view as drawn from all the cases is, that there is no absolute rule. That much is left to the judge's discretion, and which should be controlled by the surrounding circumstances, by whom the declaration is made, to whom it is made, and whether the parties possess a knowledge of its truth; whether made during a judicial proceeding, whether is acting under excitement or fear, etc.

The defendants' counsel insists, that though the evidence of silence in such cases may sometimes be received, it can only be so received when the following conditions exist, viz.: 1. In cases where it would be *natural* and *appropriate* for the accusing party to make the accusation. Substituting for " accusation" the word " charge," or " remark," there would be no objection to the allowance of such a condition. Nothing could be more *natural* or *appropriate* in its application to the case before us, than that the victim of the larceny, when brought into the presence of the parties, should point out to the officers the persons charged, and declare as to each, the part taken by them in the crime. 2. " That the accusation should be made in the presence of and addressed to the party accused." In this case it was made in the presence and hearing of the parties accused; it may have been, but it was not necessary under the circumstances of this case, that the charge should be made exclusively to the party accused. 3. " It should naturally and properly call for a reply from the party accused." There is no objection to such a con-

dition. 4. " That the party thus accused should not, at the time, be under arrest, in the presence of officers, charged with the crime." This last condition is not the rule, as I understand it. That a party is under arrest does not render his declarations or acts inadmissible. *People* v. *Wentz,* 37 N. Y. 303 ; *McKee* v. *People,* 36 id. 116 ; *People* v. *Green,* 1 Park. Cr. 17.

The learned counsel for the defendants cites various English and American authorities, to show that silence of a prisoner before a magistrate, or other officer, or while under arrest, then being charged with the commission of a crime, is inadmissible. The rule claimed by the counsel is not as broad as he claims it, nor are the cases cited at all in conflict with the rule we have above supposed to be the true one. There is a class of cases, among them those cited by the defendants' counsel, where the silence of a party is not, and ought not, to be evidence against him, where the statement is made by a witness in a *judicial proceeding.* A witness may swear to statements directly charging crime or liability against the party, and the silence is then a duty of the party. The rising up to make denial in such case would be an impropriety, if not a contempt of court. So, where a witness is swearing against him before an examining magistrate on a criminal charge, it does not demand a denial ; nor does his silence in such case amount to evidence against him. Any number of cases can be supposed, especially in judicial proceedings, where silence is a propriety as well as a duty. The distinction between all such cases, where he is acting under judicial restraint, and those in which the admission, express or implied, is voluntary, as well as in the cases in which silence is a duty ; and those where silence may be appropriately construed into an admission of assent to the charge, requires no remarkable acumen to determine. In the one case it is his duty to be silent, in the other to speak. Among the former is the case of *Sheridan* v. *Smith,* 2 Hill, 538, where the testimony of a witness in another case, in which the plaintiff was a party, was offered on the ground that the plaintiff was a party. Such, also, was the case of *Rex* v. *Appleby,* 3 Stark. 33, where it was offered to be proved that on an examination before a magistrate, of one of two prisoners, one was sworn, and testified to having committed the felony jointly with the other. So, too, the case of *Melen* v. *Andrews,* 1 Moody & Malk. 336. In that case the judge laid it down as a rule, " that the deposition of a witness taken in a judicial proceeding, in the presence of

the party charged, is not admissible in another proceeding against that party, on the ground that he was present, even though he had the opportunity of cross-examination. The judge remarked, "that he was prevented from interfering in such case; as he would not be in a conversation; that the same inferences cannot be drawn from his silence or his conduct, as in that of a conversation in his presence."

The question in *Rex* v. *Swatkins*, 4 Car. & P. 548, was decided upon another principle: that was an offer to prove the declaration of a prisoner, made in the presence of an officer in whose custody he was. This was denied, on the ground that it should be first shown that the officer had held out no inducement to the prisoner to make the confession. This case has no application. The defendants' counsel cited one other English case (*Child* v. *Grace*, 2 Carr. & P. 193), which was an offer to prove what the magistrate said, before whom a matter had been investigated, in the presence of both the parties. It does not even appear from the case, except inferentially, that the parties remained silent, but the judge, Ch. J. BEST, said: What was said "by a third party to the plaintiff is not evidence." The additional remark made by the judge in the same case proves too much for the defendants' case, viz.: "If that which was said drew any answer from the plaintiff, then that makes it evidence, otherwise not." I understand the rule to be, that if the statement of one person call forth a reply from another, such statement, in conjunction with the reply, may be given in evidence against the party replying. And in such case it makes no difference by whom the words were spoken which call forth the reply. It will appear in the case at bar, in the evidence of Captain Davison of the police, and of one other policeman, that at the station-house when Reynolds was pointing out the defendants to the officers — Armsby as the man who scooped in his money — and Kelly as the man who introduced the dice, and making the declarations proved — no reply was made by either of them, as to the charge against themselves, but when he pointed out Palmer as the pretended city attorney, both Armsby and Kelly replied, by saying, "he was mistaken," "he (Palmer) did not belong there; that he simply dropped in." This is the strongest implication that he was right as to them, but wrong as to Palmer.

If this is a fair inference, then the cases cited for the defense fail to show error upon this point. And even if the admission of the evidence complained of was error, when admitted, it was

cured by this evidence of the declarations of these two defendants, as to them. There was no judicial proceeding going on. The pointing out of the criminals was a part of the *res gestæ*. What the complainant said beyond this, was the imputation of a criminal charge; a statement injuriously affecting the reputation of these two parties; a statement which, if received in silence — not replied to — under the rule, as we understand it, is evidence for a jury to consider, and from which silence guilt may be impliedly admitted. It is the duty of a court, in the exercise of a sound discretion, to charge a jury to receive this character of evidence with great caution. There does not seem to be any complaint against the charge in this regard. In the cases above cited, upon the respective sides, and reviewed, I am not able to say there is any material conflict. They can easily be distinguished by the rule I have attempted to show.'

There is one case, however, cited from Massachusetts, by the defendants' counsel (*Commonwealth* v. *Kenny*, 12 Metc. 235), which has features in conflict with the rule I have adopted, though there were peculiar circumstances in that case which seemed to control its decision. The court, however, not only concede, but lay down the general doctrine to be as we have stated it. We cannot do justice to that case, nor to the present, without a large extract from it. The defendant was indicted for stealing money and a bag, from the person of one Russel. Russel was not called as a witness, but evidence was offered to show that declarations were made by Russel, at the watch-house, in the presence and hearing of the defendant, in regard to the theft, to which the defendant made no reply. This evidence was objected to, but admitted by the court, and its admission excepted to. Other questions were in the case, but the judge in court, upon this point, reasons thus : He says the legality of the ruling depends upon this : " If a statement is made, in the hearing of another, in regard to facts affecting his rights, *and he makes a reply*, wholly *or partially*, admitting their truth, then the declarations and · reply are both admissible." * * * " In *some cases*, where a similar declaration is made in one's hearing, and he makes no reply, it may be a tacit admission of the facts. But this depends upon two facts: *First*. Whether he hears and understands the statement, and comprehends its bearing; and, *Secondly*. Whether the truth of the facts embraced in the statement is within his own knowledge, or

not; whether he is in such a situation that he.is at liberty to make any reply; and, whether the statement is made under such circumstances, and by such persons, as naturally to call for a reply, if he did not intend to admit it. If made in the course of any *judicial hearing*, he could not interfere and deny the statement; it would be to charge the witness with perjury; and alike inconsistent with decorum and the rules of law. So if the matter is of something not within his knowledge. So if the statement by a stranger whom he is not called upon to notice; or, if he is restrained by fear — by doubts of his rights — by a belief that his security will be best promoted by his silence; then, no inference of assent can be drawn from that .silence." So far, these general rules will obtain the assent of all. So will the following: "Perhaps it is within the province of the judge, who must consider these preliminary questions in the first instance, to decide ultimately upon them."

That is just what was done in the case at bar. Circumstances differ; of course, the ruling will differ to meet the circumstances. In the case from which we have been extracting, the learned judge thought the circumstances were such, that the declaration of the party robbed, to which the defendant made no reply, ought not to have been received as competent evidence against him. He might have been right in that case. It was not as strong as the case at bar. The following are the circumstances of that case : A witness testified, that being in one of the watch-houses in Boston, late in the evening, two watchmen of the city, having defendant in custody, came in, and one of the watchmen said, "Here is a man that has been robbing a man." Presently, Russel, the person named as having been robbed, came in crying, and said: "that man," pointing to defendant, "has stolen my money." The defendant was searched; no money found on him. While they were proceeding down stairs to lock defendant up, he was seen to hide something upon a shelf. Witness went to the place, and saw a bag, which he took up and said, "here's the bag;" the defendant was then on the stairs going down cellar, and within hearing. Russel immediately said, "that is my bag." One of the officers went to counting the money, the defendant standing by. Russel then said, "that was all the money I had. in the world." The defendant made no reply to any of the aforesaid declarations. The learned judge remarked, I think justly, "the declaration made by the officers who first brought the defendant to the watch-house, he has certainly no occasion to reply to." It was made by one hav-

ing no knowledge of the fact, and being an officer, it was an impertinent and an officious interference. Of course, this was improper. As to the other declarations made by Russel, the judge, I think, justly remarks: " The subsequent statement, if made in the hearing of the defendant, was made while he was under arrest, and in the custody of persons having official authority. They were made by an excited and complaining party to such officers as were just putting him into confinement. If not strictly an official complaint to the officers of the law, it was a proceeding very similar to it, and he might well suppose he had no right to say any thing until regularly called upon to answer."

If, in any respect, the case differs from the case at bar, I do not think it is in conflict with it. The judge is emphatic, and makes that one ground that the defendant was under arrest. That is not a ground of objection here in our courts. The declaration in that case was not made to the defendant himself. It was made to an officer, who had already, without knowledge of his guilt, proclaimed him a thief. A reply was not called for under such circumstances. If it is in conflict with the rule we have annunciated, it is also in conflict with the mass of authority we have cited, and with a case in Seneca county, reported in 1 Gray, 83, it stands alone. In the case at bar, the circumstances are strong enough to sustain the ruling, and to leave to the jury the consideration of the declarations of the complainant, the silence of the defendant as to a part, and their answer or reply to the other part, of the charge.

There are some other objections raised on the trial, though not much urged on the argument here, which I do not regard of sufficient merit to discuss at length. Among them, that this evidence of the declarations of Reynolds, and the reply of a *part* of the defendants, was neither the *res gestæ*, nor proper to establish a conspiracy. The pointing out, by Reynolds, of the defendants to the officers, I think, was a part of the *res gestæ*. What he said beyond this we have discussed. The conspiracy was sufficiently established, if Reynolds was to be believed, when he had described the actors, and the parts taken by each at the saloon. Upon the merits the conviction was right, and seems to have been demanded by public justice. The judgment and conviction should be affirmed.

MILLER, P. J., and PARKER, J., concurred.

*Judgment and conviction affirmed.*