THE PEOPLE OF THE STATE OF NEW YORK, DEFENDANTS IN ERROR, *v.* NATHAN O. GREENFIELD, PLAINTIFF IN ERROR.

*Evidence — when a witness, not an expert, may state that a spot consists of blood — the deportment of one while freshly accused of crime may be shown on his trial — what statements are inadmissible as heresay — declarations of a third person that he is guilty of the offense are inadmissible — what declarations are inadmissible as part of the res gestæ — when the jury may consider the refusal of the accused to testify before the coroner — what errors in a charge may be cured by subsequent instruction.*

The plaintiff in error, was indicted, tried and convicted of murder in the first degree for killing his wife. The wife was found dead in her bedroom, with the mark of a severe blow from a club upon her head, and with her throat cut; the walls of the room and articles therein were spattered with blood and a pool of it lay upon the floor under her bed. Upon the trial a witness called for the prosecution having testified that on the morning of the day of the murder he saw a spatter or spot of a darkish red color on a flat stone in the path leading from the prisoner's house to the road, and having stated that he could swear, as a matter of fact, what the substance on the stone was, was asked to state what it was. The prisoner's counsel having objected to this question on the ground that it was immaterial and irrelevant, and that the witness was not qualified to express an opinion whether it was blood or not, as he was not an expert, the court instructed the witness that his opinion was not asked for, and if he answered he would only be allowed to answer, as a fact, what the spot was. The witness then answered that the spot was blood.

*Held*, that the witness was properly allowed to answer the question, as the evidence referred to a matter of common observation, as to which an ordinary witness could speak.

Upon the trial evidence as to the conduct and bearing of the prisoner on the day of the murder, tending to show an indifference on his part as to the death of his wife, was offered by the People and received against the defendant's objection and exception.

*Held,* that the evidence was properly received for the purpose of showing how the prisoner demeaned himself when the imputation of this crime was fresh upon him, and also to rebut the legal presumption that the affection existing between husband and wife will deter either one of them from wantonly doing an injury to the other.

The counsel for the plaintiff in error offered in evidence two letters purporting to have been written by one Royal Kellogg, from Indiana, one to his brother Alden Kellogg, who resided at the place of the murder, and the other to the sheriff. In these letters he admitted that he committed the murder, and that the prisoner was innocent. Both of the Kelloggs were in court at the time, but neither of them was called as a witness by either party.

*Held,* that the court properly excluded the letters as hearsay or derivative testimony, and also on the general ground that upon a trial for murder, declarations or admissions of persons, other than the prisoner, that they had killed the deceased, are not competent evidence in his favor.

One Wyman, a witness for the defense, who lived in the house of one Taplin, about a mile and a-half from the prisoner's house, testified that, at about four o'clock in the morning of the day of the murder, he was awakened by the barking of a dog, and on looking out of the window he saw the two Kelloggs and Taplin standing back of the house; that Alden Kellogg had a double-barreled gun and Taplin a bag with something in it; that one of the men washed his hands at the pump; that they changed their coats; that the Kellogs went away with the gun and bag, and Taplin came into the house; that he heard a part but not all of the conversation. The counsel for the prisoner then offered to prove that on that occasion the witness heard Taplin say to Kellogg, "you were damned fools to do it," and that one of the Kelloggs replied, "if we had not done it we should all have been hung." No other evidence was given tending to show that Taplin was with the Kelloggs on that night, or to connect the Kelloggs or either of them with the murder, or to show that the parties, or the gun and bag, came from the prisoner's house.

*Held,* that the court properly refused to allow the question to be put.

One Snow, a witness for the People, testified that on the evening of the day of the inquest the prisoner, after having been arrested and told by the coroner that he might get counsel or answer, or decline to answer, as he chose, asked the witness what he should do, and that the witness told him "if you are innocent you can answer all the questions they can ask you, if not you can decline," and that the prisoner said he would answer any questions they wanted to ask. The People then proved that the prisoner had declined to answer any questions before the coroner. The court, in charging the jury, stated that the fact that the prisoner refused to answer any question was not a circumstance which could be taken into consideration against him, as one indicating his probable guilt, unless it was accompanied by the statement made by Mr. Snow that if he

was guilty he should decline, but if he was innocent he should go on. The counsel for the prisoner excepted to the latter portion of the charge.

*Held*, no error; that as the evidence had been received without objection by the prisoner the jury might properly consider it as showing a part of his conduct while acting under the charge, and as tending to show a vacillation somewhat suspicious.

That his answer to Snow might be considered as a consent to submit to an examination, and that he was thereafter subject to the same presumption as if his subsequent refusal to answer questions had occurred during an actual examination.

After the charge, and before the jury had consulted on the case, the court called the jury back and in the presence of the prisoner and his counsel instructed them that as the evidence relating to the prisoner's declining to answer, after the interview between him and Snow, was somewhat equivocal and they might be inclined to give it more weight than it should receive, they should not consider the fact of his declining to answer questions as evidence tending in any degree to establish his guilt in the case, but should wholly exclude all such evidence, and what had been said about it in the charge, from their consideration, and give it no weight whatever in the case.

*Held*, that the error, if any, in the charge was thereby cured.

WRIT of error to the Court of Oyer and Terminer to review the trial and conviction of the plaintiff in error of murder in the first degree.

*S. C. Huntington*, for the plaintiff in error. The court erred in admitting the evidence of Albert E. Stevens and George Pennock, as to blood stains. Stevens and Pennock were not experts as to blood stains, nor were they competent or qualified to testify, nor had they sufficient knowledge of the facts to testify as to whether the stains upon said stone and upon said pump and platform were caused by blood or not. (*Major* v. *Spies*, 66 Barb., 576; *Mark* v. *The People*, 17 Hun, 410; *Messner* v. *The People*, 45 N. Y., 104; *The People* v *Rector*, 19 Wend., 569; *Wilson* v. *The People*, 4 Park., 619 · *Van Zandt* v. *Mutual Benefit Life Insurance Co.*, 55 N. Y., 169; *Haggerty, by Guardian*, v. *The Brooklyn City and Newtown R. R. Co.*, 61 id., 624; *Morehouse* v. *Mathews*, 2 id., 514; *Sloan* v. *N. Y. C. R. R. Co.*, 45 id., 125; 2 Best on Evidence [Wood's ed.], §§ 511–517, and note *a*; Whart. and Stille's Medical Juris. [2d pt., 3d ed.], §§ 724–770, and notes; Taylor's Medical Juris., by Reese [7th Am. ed.], 291–300; Forensic Medicine, Guy and Ferrier, 321–334; Trial of Webster [Rev. ed., 1879], 131, 132; *De Witt* v. *Barley*, 5 Seld., 371; 29 N. Y., 27; *Nelson* v. *Sun*

*Mutual Ins. Co.*, 71 id., 453–460; *Lane* v. *Wilcox*, 55 Barb., 615; *Rust* v. *Eckler*, 41 N. Y., 488; Wills on Circumstantial Ev., 174, 188, 189; *Vandervoort* v. *Gould*, 36 N. Y., 644; Whart. on Homicides [2d ed.], 683–686, and notes.) The court erred in admitting evidence to show that the prisoner shed no tears on the day of his wife's death. (1 Whart. & Stille's Medical Juris., §§ 426–428; Rush on the Mind, 40, 346, 347; Doctor Cheyne on Derangement in Connection with Religion, 107; Marshall's Physiology, 419; *Gibson* v. *American Life Ins. Co.*, 37 N. Y., 580; 1 Greenl. Ev. [13th ed.], §§ 12, 13, 52; Mental Physiology, by W. B. Carpenter [1874], 324–330, §§ 365–369; The Emotions, by James McCosh, Prest. of Princeton College, 89, 90, 94, 95; The Emotions and Will, by Alexander Bain, LL.D. [3d ed.], 26, 27, 31, 36, 41–45, 359–363.) The court erred in excluding the letters by Royal Kellogg, and also in excluding the evidence of E. D. Wyman as to the conversations between A. & R. Kellogg and John Taplin. The following authorities establish the competency of such conversation and letters; neither was irrelevant nor immaterial; each tended to qualify and explain the acts of the Kelloggs, and to give character to such acts: 1 Greenl. Ev., §§ 108, 109, 111, 114, 90, 100, 108, 124, 125, 135, 138, 139, 147–155, 156–160, 169, 181, 251; *Commonwealth* v. *McPike* (3 Cush., 181); *Insurance Co.* v. *Morley* (8 Wall. [U. S.], 397); *Jordon* v. *Case* (25 Grat. [Va.], 943); *Mundy* v. *The State* (32 Ga., 672); *Hart* v. *Powell* (18 id., 635); *Roach* v. *Learned* (32 Me., 110); *Dobbs* v. *Justice* (17 Ga., 624); 1 Whart. Ev., §§ 259–266; *Mobile R. R. Co.* v. *Ashcraft* (48 Ala., 15); 1 Whart. Ev., §§ 175, 258; 2 Best on Ev., § 495; *Casey* v. *N. Y. Cent. and H. R. R. R. Co.* (78 N. Y., 518); *Brownell* v. *Pacific R. R. Co.* (49 Mo., 239); *Lambert* v. *The People* (29 Mich., 71); *Week* v. *Perry* (36 Miss., 109); *The People* v. *Roach* (17 Cal., 297); Starkie on Ev. (10th ed.), 78, 87–90; 1 Phillips' Ev. (Cow. H. & Ed. notes, ed. 1859), 185–188, 202, 203; id. (ed. 1868), 152–164. A fatal error was committed by the court in charging the jury as to their right to consider the refusal of the prisoner to answer questions before the coroner. The fact that Snow had told him that if he was innocent he better answer, but if guilty he better not answer, does not, cannot and should not change the legal consequences of a refusal to answer. (1 R. S. [6th ed.], 31, and

cases in note 1, 82 ; art. 1, § 6, and cases in note 1, 83 ; 3 R. S. [6th ed.], 1000, § 15, 1032 ; *Ruloff* v. *The People*, 45 N. Y., 213, 221 ; *Crandall* v. *The People*, 2 Lans., 309–313 ; *Commonwealth* v. *Scott*, 123 Mass., 239 ; 25 Am., 87 ; *Commonwealth* v. *Nichols*, 114 Mass., 285 ; 19 Am., 346 ; 110 Mass., 411 ; *State* v. *Commonwealth*, 65 Miss., 374 ; 27 Am., 291 ; *The People* v. *McCoy*, 45 How. Pr., 216.)   The judge had no legal right to recall and so charge the jury a second time.   (*Myer* v. *Clark*, 45 N. Y., 285 ; *O. Sullivan* v. *Roberts*, 7 J. & Sp., 360 ; *Furst* v. *Second Avenue R. R. Co.*, 72 N. Y., 542 ; *Erben* v. *Lorillard*, 19 id., 299 ; *Green* v. *White*, 37 id., 405 ; *Duffany* v. *Ferguson*, 66 id., 482 ; *Smith* v. *Isaacs*, 58 id., 680 ; *Bayard* v. *Daily*, 68 id., 547 ; *Brague* v. *Daily*, 67 id., 495 ; *Hydorn* v. *Cushman*, 16 Hun, 107 ; *Lambert* v. *The People*, 6 Abb. [N. C.], 181 ; *The People* v. *Willy*, 3 Hill, 194– 214 ; *Traver* v. *Eighth Avenue R. R. Co.*, 3 Keyes, 497 ; *Allen* v. *James*, 7 Daly, 13 ; *Newman* v. *Goddard*, 48 How. Pr., 363 ; *Ferguson* v. *Lord*, 67 N. Y., 495 ; *Wright* v. *Equitable Life Ins. Co.*, 9 J. & Sp., 1 ; *Commonwealth* v. *Scott*, 123 Mass., 239 ; 25 Am., 87 ; *Commonwealth* v. *Nichols*, 114 Mass., 285 ; 19 Am., 346 ; *Commonwealth* v. *Hollow*, 110 Mass., 411 ; *State* v. *The Commonwealth*, 65 Mo., 374 ; 27 Am., 291 ; *Baird* v. *Gillett*, 47 N. Y., 186 ; *Williams* v. *Fitch*, 18 id., 566 ; *Osgood* v. *Manhattan Ins. Co.*, 3 Cow., 612 ; *Worrall* v. *Parmela*, 1 Com., 519 ; *Starbird* v. *Barrows*, 43 N. Y., 200 ; *Arthur* v. *Griswold et al.*, 55 id., 400, 408 ; *Green* v. *Hudson R. R. R. Co.*, 32 Barb., 25, 34 ; *Coleman* v. *The People*, 58 N. Y., 561, 562 ; *Scribbs* v. *Reilly*, 35 Mich., 371 ; 24 Am., 575, 582, 583 ; 6 Hill, 292 ; *Carnes* v. *Platt*, 6 Robt., 270, 281 ; *Traver* v. *Eighth Avenue R. R. Co.*, 6 Abb. [N. S.], 46, 49 ; Ct. of App., 3 Keyes, 497 ; *Watertown Bank and Loan Co.* v. *Mix*, 51 N. Y., 558 ; *Brown* v. *Swinford*, 44 Wis., 282 ; 28 Am., 582.)

*William C. Ruger*, for the defendants in error.   The evidence of the witnesses Stephens and Pennock, as to the existence of blood-stains upon stones lying along the road leading from the house of the prisoner to that of his father, and upon the platform of Richard Greenfield's pump, was competent, and the objections were properly overruled.   (*Com.* v. *Dorsey*, 103 Mass., 412 ; *Peo.* v. *Eastwood*,

14 N. Y., 562; *Clapp* v. *Fullerton*, 34 id., 190.) The evidence establishing the absence of physical demonstrations of grief by the accused was also competent, and the exception was not well taken. (*McCann* v. *People*, 3 Parker's Cr., 273; Roscoe's Cr. Ev., 18 *; Burrill on Circumstantial Ev., 502; *McKee* v. *Nelson*, 4 Cow., 355; *Trelawney* v. *Coleman*, 2 Stark., 191; *Culver* v. *Dwight*, 6 Gray, 444.) The letters purporting to be in the handwriting of Royal Kellogg, and alleged to contain a confession that he murdered Alice Greenfield, were properly rejected. (2 Best on Ev., §§ 559, 560, 563, 565, 570; 1 Wharton's Am. Cr. Law, § 684; *Commonwealth* v. *Chabbock*, 1 Mass., 144; *Smith* v. *State*, 9 Ala., 990; *Snow* v. *State*, 54 id., 138; 58 id., 372; *State* v. *May*, 4 Dev. Law, 328; *State* v. *Duncan*, 6 Iredell Law, 236.) The declarations of Taplin and the Kelloggs, offered to be shown by the witness Wyman, were properly rejected. (*Carter* v. *Buchanan*, 3 Ga., 813; Wharton's Cr. Ev., § 262; *Moore* v. *Meacham*, 10 N. Y., 210; *Rockwell* v. *Taylor*, 41 Conn., 56.) The declarations must not be a narrative of the past, but the natural or inseparable concomitants of the principal fact in controversy, and therefore presumed to have been induced by the motive that led to the act in question. (1 Greenleaf on Ev., § 110; *Meek* v. *Perry*, 36 Miss., 190; *Riggs* v. *State*, 6 Cold., 517; *People* v. *Davis*, 56 N. Y., 95–102; *Luby* v. *Hudson R. R. R. Co.*, 17 N. Y., 131; *Ins. Co.* v. *Moseley*, 8 Wall., 405; *People* v. *Symonds*, 19 Cal., 275; Taylor on Ev., § 526; *Lund* v. *Tyngsborough*, 9 Cush., 36; *Com.* v. *Harwood*, 4 Gray, 41; *Scraggs* v. *State*, 8 Sm. & M., 722; *Rockwell* v. *Taylor*, 41 Conn., 56; *State* v. *Haynes*, 71 N. C., 79; *State* v. *White*, 68 id., 158; *Riggs* v. *State*, 6 Cold., 517.) There is no virtue in the exception taken to the judge's charge, with reference to the conversation with Hiram Snow. (*Connors* v. *People*, 50 N. Y., 230; *Stover* v. *People*, 56 id., 315; *McGary* v. *People*, 2 Lans., 232.) Even if there was error in the charge, it was cured by the subsequent instruction given to the jury directing them to disregard and exclude from consideraation, while deliberating upon the case, the charge of the judge, as well as the evidence relating to the interview between the prisoner and Snow on the day of the inquest. (*Lindsay* v. *People*, 67 Barb., 549, affirmed in 63 N. Y.; *People* v. *Parish*, 4 Denio, 156; *Smith* v. *Maxwell*, 1 Stewart & Porter [Ala.], 221; *Clay* v. *Miller*, 3

T. B. Mon., 146; *Imhoff* v. *Chicago, etc., R. R. Co.*, 20 Wis., 347.)

RUMSEY, J.:

The prisoner was indicted in Oswego county for the murder of his wife Alice, in that county, on the morning of the 21st October, 1875. He was tried in that county in February, 1877, and convicted of murder in the first degree, which was reversed in the Court of Appeals for an error in empanneling the jury by the trial court. (74 N. Y., 227.) The place of trial was changed to Onondaga county, where he was tried in September and October, 1879, when he was again convicted and sentenced to be executed on 12th December, 1879. He was three times respited by the Governor, the last time to the 23d of April, 1880, and on the 20th of April the execution was stayed on the allowance of the writ of error by a justice of this court. The bill of exceptions does not purport to contain all the evidence given on the trial, but does set out a portion in detail, and the general tendency of other portions so far as is necessary to give to the court a clear understanding of the several exceptions taken at the trial, and the relation which those exceptions bear to the case. From this general statement it is evident the case presented an array of facts and circumstances proper for the jury, calling upon them for a patient consideration and careful analysis to determine the relation of the several facts with each other, and the aggregate weight of the whole. Such consideration, we have no doubt, the evidence received, but this court is not called upon to examine it, further than may be necessary to determine the validity of the exceptions taken as to the admission or rejection of testimony given or offered on the trial, and to the charge of the court upon the relation of the rules of law to such evidence. Four exceptions are insisted upon on the part of the prisoner, and they have been discussed by his counsel with such zeal and ability as the peril in which his client is placed demands. In order to understand the full scope of the first exception, it is necessary to refer to some of the facts in the case.

The prisoner and his wife were young; had been married about four years; their married life had been one of discord and was characterized on his part with much cruelty, at times manifested by

personal violence. The prisoner lived a short distance back from the highway in front of his house, his father resided about twenty rods, and his uncle, Wm. Grinnell, about thirty rods distant from the prisoner's house. On the day before the murder he had been engaged threshing, some two miles from home, and did not intend to return that night, but hearing that his wife intended to leave him and a man named Hinds was to help her off, he went home and had an interview with her about twelve o'clock in the night, in which she said she intended to leave him and go to Michigan, where, after a year's residence, she could obtain a divorce and marry another person. There was also evidence tending to show the prisoner asked her to release all claim to his property, which she refused to do, and that prisoner in repeating this interview the next morning said he had made up his mind if she was not to be his wife she shouldn't be anybody's else. After this interview the prisoner went to his father's house and went to bed, which was not usual for him to do. The indications were that while the deceased was sleeping she received a severe blow from a piece of edging off a board which left a plain indentation from the eyebrow to the hair, and the club broke from the force of the blow, and her throat was cut severing the artery, the jugular vein and the nerves. As there was no discoloration or swelling around the bruise on the forehead it is probable the wound on the throat was inflicted directly after the blow on the head. The blood from this wound had spurted on the wall near the bed; there was a considerable pool of blood on the floor under where the body lay, and when found it was still warm. The evidence tended to show that on the night of and immediately before the murder, the prisoner wore an army overcoat without a cape, much soiled and greasy, which could not afterwards be found. The prisoner swore that after going to bed at his father's the night of the murder he saw a light at one of the windows of his house; that he dressed himself, went down stairs where he had left his boots, took them out doors and put them on to avoid disturbing his father and mother, who were asleep; that he then went over, and, inside the yard in front of the house, saw through the window a man he took to be Hinds carrying the light; stood there a minute, went back to his father's, called him up and then went to his uncle Grinnell and told him to get up that Hinds had come and he must

come right down there; that he then went back to his father's, and while doing so the light went out in his own house; all these went over to prisoner's house and he pushed the door open a little; then went to the barn and found all right; went back and asked what they should do, and his uncle replied go in the house; that he went in, and as he was going into the bedroom for a lamp he struck his foot against the corpse of his wife and went back to get a match. Grinnell swears that when the prisoner in the house had walked about the time and distance necessary to cross the floor to within two or three feet of the bedroom door he said, "Oh my God! I'll bet she is dead;" that there was no light there, and all the window curtains but one were down. The prisoner also swore that when he left his house and went to his father's he left the lamp, of which they had but one, on the stand in his wife's bedroom.

On the trial Alfred E. Stevens for the prosecution testified that about ten o'clock in the forenoon of the day of the murder he saw a spatter or spot on a flat stone in the path leading from the prisoner's house to the road, and about two rods from the house; that the stone was about three to five inches across; that there were a few drops or spatters from the size of a hay-seed to the size of a kernel of wheat; the color was a darkish red; that he was able to state what that substance on the stone was. He was then asked to state what it was, to which prisoner's counsel objected for the reasons: 1st. It was irrelevant and immaterial. 2d. That the witness was not qualified to express an opinion whether it was blood or not as he was not an expert. The court held and instructed the witness that his opinion was not asked for, and if he answered he could be only allowed to answer as a fact what the substance was, that his opinion was not to be stated. The witness said he could swear as a matter of fact what it was, and was allowed to do so. To which the prisoner's counsel excepted. The witness answered, the spots were blood. Similar evidence as to spots of blood found near the father's house was allowed under similar circumstances, to which an exception was also taken by the prisoner's counsel. The objection to this evidence is founded upon the assumption on the part of the prisoner's counsel, that no one save an expert witness can state as a matter of fact whether the substance upon the stone was blood or not when there is nothing in the case to sustain such assumption.

The witness was not asked for an opinion, but was in express terms informed that unless he could state as matter of fact what the substance was, he was not to answer, and upon his statement that he could tell as a fact what it was he was allowed to answer that it was blood. In view of this statement of the case the admission of the evidence was correct, and it became a question for the jury to determine the credit to be given to it when, on a cross-examination of the witness or otherwise, the means of his knowledge should more fully appear. To sustain an objection under such circumstances would exclude a large amount of evidence which has heretofore been admitted by the courts unquestioned. Soap and salt and others of the most common substances are composed of ingredients unknown to those in daily contact with the compounds, yet they know their names and are familiar with their use, while none but a chemical expert upon a careful analysis could say whether they were in truth the substances they are supposed to be. The deceased was found dead with a quantity of red substance upon the floor and spattered upon the wall near, and the witnesses testified, apparently without objection, that it was blood. It would have been a strange, not to say absurd, application of the rule in regard to expert testimony to apply it to the case of the blood thus found by the body, yet the objection may with equal propriety be made to that as to the substance found upon the stone. This same question was fully and sensibly discussed by Judge PORTER, in *The People* v. *Gonzalez* (35 N. Y., 49, at pages 60, 61 and 62), in which it was held that evidence precisely like this was properly admissible, and that matters of common observation may ordinarily be proved by those who witness them without resorting to mechanical or scientific tests to verify them. (See, also, *Commonwealth* v. *Sturtivant*, 117 Mass., 122, 132, and cases there cited; *People* v. *Eastwood*, 14 N. Y., 562.) If the question, instead of being whether the substance was blood, had been whether it was the blood of a human being or some other animal, the known difficulty of distinguishing between the two, without resorting to scientific or professional tests for that purpose, would, perhaps, have been sufficient to sustain an objection to the evidence without proof of such difficulty, but as the case stood the evidence objected to referred to a common matter of which an ordinary witness could

speak. The fact that the death occurred from means which induced a large flow of blood so that it spattered upon the wall of the room in which the body lay, in connection with the other facts that the prisoner's knife was found the same morning with blood upon it not yet dried; that the lamp which the prisoner swore he left the night before on the stand in the bedroom of his wife was found with spots of blood upon it, and the army overcoat worn by the prisoner the night before the murder could not afterwards be found, rendered this evidence as to the blood on the stone in the yard and around the pump a few rods distant from the prisoner's house material and proper to be submitted to the jury, and they alone were to judge of its weight.

At the trial evidence was offered on the part of the People of the conduct of the prisoner on the day of the homicide, tending to show an indifference on his part to the death of his wife. This evidence was confined to the day of the homicide, and was given by witnesses who saw him in the presence of his wife's remains, as well as by others who did not see him in such presence. Amongst others the following question was asked : " Did you frequently see the prisoner on the day of his wife's murder, the day of the coroner's inquest upon her body ? " To which the answer was, I did. The question was then put. " Did you see the prisoner shed any tears that day ? " The prisoner's counsel objected to this as irrelevant, incompetent and improper, and as constituting no legal evidence of his guilt, which was overruled by the court and the prisoner's counsel excepted, and the answer was, I did not see him shed any tears. One witness testified he did see the prisoner weeping on the day of the homicide. It is evident, from the bill of exceptions, this is but part of an extended examination as to the indifference manifested by the prisoner at the death of his wife. The acts of a party charged with crime, tending to show he had procured the means of committing an offense, or that he was in a situation where he might have done so, have always been competent as evidence, although such acts constitute no part of the criminal act. So, too, his threats previously made are proper evidence, not for the purpose of proving he had committed the crime, but to show he had the means of doing so, and that it had been the subject of his contemplation. " In almost every criminal case a portion of the evidence laid before the jury consists of the

conduct of the party either before or after being charged with the offense, presented not as part of the *res gestæ* of the criminal act itself, but as indicative of a guilty mind" (Roscoe's Crim. Ev., 17), or as an uneasy deportment justifying the supposition of a guilty conscience, as it is expressed in Wharton's American Criminal Law (§ 861). Burrell, in his treatise on Circumstantial Evidence, devotes several sections of chapter one, part two, to the discussion of this class of evidence; and Judge ALLEN, in case of *Lindsay* v. *The People* (63 N. Y., 143), says: "The acts and declarations of a party are evidence against him, and whether they tend to fix a crime upon him is for the jury." (Roscoe on Cr. Ev., 18, before cited.) Under these authorities the evidence objected to was properly admitted, for the purpose of showing how he demeaned himself when the imputation of this crime was fresh upon him. This evidence was also properly admissible for another reason. The courts recognize certain presumptions of law based upon the relations of society, one of which is that the affection existing between husband and wife will deter either from wantonly working an injury to the other. This, like all other presumptions of law, may be overthrown by facts leading to a contrary presumption. (Will on Circumstantial Ev., 20.)

The facts that the prisoner had, before her death, treated his wife with much cruelty; that he stood apparently unaffected beside her murdered body, and that when the witness Alginer said to him, "this is a pretty sad affair that occurred at your house last night, Orlando," the only response he had to make to it, was, "yes, sir; I had a load of oats stole," all indicate that if he ever had any affection for his wife, it had ceased to exist. The evidence was proper to repel the presumption of law referred to. (*The People* v. *Hendrickson*, 8 How. Pr., 412, 413; affirmed, 10 N. Y., 12; *The People* v. *McCann*, 3 Parker's Cr., 272–294.)

At the trial the prisoner's counsel produced a letter dated August 21, 1876, purporting to have been written from Lafayette, Ind., by Royal Kellogg to his brother Alden Kellogg. The body of the letter referred to family matters, and after the name is the following: "Write soon; from your brother Royal Kellogg. We will not think of the past, but of the hereafter. Tell me all about the murder. If you think it all right tell them I am in Lafayette, and

if they want me they can come and get me," etc. .The prisoner's counsel also produced another letter with an envelope. The letter was as follows: "Spare Greenfield i killed his wife after satisfying my inhuman lust on her senseless form since that time i have been in the wilds of Mich, yet I can't doo a dubble murder i am a jirman & before you get this I shall be gon far away why clamer after his life he is inocent." Upon the envelope was a postage stamp, the postmark was "Grand Rapids, Mich., May 9, 10 A. M.," and the address was to the "sharuf of Oswego Co., N. Y., put this thru in hast it will save a man." Elizabeth Kellogg, a witness for the prisoner, testified she was sister-in-law to Royal Kellogg, had seen him write and was acquainted with his handwriting, and that the letter and envelope were in his handwriting. The letters and the envelope were severally offered in evidence on the part of the pris- oner, were objected to by the counsel for the prosecution and excluded, and the prisoner's counsel excepted to each ruling sever- ally. Both the Kelloggs were in court during the time the evidence was given for the prosecution and defense, and neither party called either as a witness. It is difficult to discover any principle upon which this evidence was admissible. In a civil action brought to recover the price of a horse sold by one party to the other, the defendant would hardly think of offering the oral or written state- ment of a third person that he was the party who purchased the horse of plaintiff, and the defendant was in no manner a party to the transaction. Such an offer would not be entertained for a moment in any court, and would be rejected, not because the alleged statement was immaterial, but for the reason that the proof offered to establish it was entirely unreliable and in direct conflict with every recognized rule of evidence. The letters thus offered have none of the features which would make them competent evidence in favor of the prisoner, for they are not acts tending to establish the fact that Kellogg killed Mrs. Greenfield, nor are they res gestœ or declarations cotemporaneous with an act and tending to give character to it. They come strictly within the rule that no hearsay or derivative testimony shall be received which has been well defined to be evidence which shows on its face that it only derives its force from some other which is withheld. (1 Best's Ev., §§ 89, 507.) Such evidence cannot be given to establish any specific fact

which in its nature is susceptible of being proved by witnesses who can speak from their own knowledge. (1 Greenl. Ev., § 99.) The question with regard to this class of evidence is not whether it comes by word of mouth or by writing, but whether it is original in its nature or indicates any better source from which it derives its weight. (2 Best's Ev., § 495.)

These letters derive all their force or effect as statements of an alleged fact from any credit which may be given to Royal Kellogg, from whom it is claimed they emanated, and he is the better source from which they derive all the weight there is in them, and it is an effort to make his mere written statement, proof of a fact which can be established only by his sworn evidence. But it is not necessary to resort to inferences from the rules of evidence to warrant the rejection of these letters, for it is supported by express authority. Declarations of third persons in reference to the offense with which the prisoner is charged are hearsay and inadmissible as evidence. (Whart. Crim. Law, § 662.) And on a trial for murder the admissions of other persons than the prisoner, that they killed the deceased are not competent evidence. (*State* v. *Duncan*, 6 Iredell, 326; *Smith* v. *State*, 9 Ala., 990; *Commonwealth* v. *Chabbock*, 1 Mass., 144.)

Wyman, a witness for the prisoner, swore that he lived one and a-half miles from the prisoner, and on the night of the murder staid at the house of his son-in-law John Taplin, about three-fourths of a mile from prisoner's house, and slept up stairs; that about four o'clock in the morning he was awakened by the barking of a dog; looked out the window and saw three men who took out a bottle and drank from it, and stopped four or five minutes back of the house; that the men were Alden and Royal Kellogg and John Taplin, and Alden had a double-barreled gun and Taplin a bag with something in it; one of the men went to the pump and washed his hands; Taplin got a coat and put it on; took off his coat and went to the horse barn and got a coat; that Royal Kellogg put on the coat brought from the horse barn; that the Kelloggs went away taking the gun and the bag; Taplin went in the house, and witness saw no more of them that night; that while there he heard them talk, but did not hear all they said. The prisoner's counsel then offered to prove that on that occasion he heard Taplin say to

Kellogg, " You were damned fools to do it," and one of the Kellogg's replied, " If we had not done it we should all have been hung." This was objected to on the part of the People. The objection was sustained and the prisoner's counsel excepted. No other evidence was given tending to show that Taplin was with the Kelloggs that night, or tending to connect the Kelloggs or either of them with the murder. So much of the evidence of Wyman as was thus received on the trial tended to some extent to create a probability that the Kelloggs and Taplin were in some way connected with the murder, and was therefore admissible for that purpose. On the part of the People it was contradicted by the evidence of Mrs. Alden Kellogg that her husband and Royal Kellogg, who lived with them, left home after supper; were gone until between ten and eleven o'clock, when they returned, went to bed and remained there all night. Mrs. Hinds testified that the two Kelloggs came to her house between eight and nine o'clock that evening to see her husband, who was absent; that they remained there till he returned, between nine and ten, and they left there about ten o'clock. A number of witnesses gave evidence tending strongly to show that some two weeks before the murder, Taplin and his family went to his father's, some twenty-seven miles from his residence, and did not return until the day after the murder, when he came home bringing with him a load of apples. The evidence of Wyman, and that offered in regard to the letter for the purpose of inducing the belief that Kellogg killed Mrs. Greenfield, is so entirely at variance with the statements of the prisoner at the time of the murder, and testified to by him afterwards, tending to fasten the crime on Hinds, as to excite the suspicion that both were devices to save the prisoner from the effect of the array of circumstances proved against him. This, however, was a matter for the consideration of the jury, and does not affect the question of the rejection of the declarations of Taplin and Kellogg on the night referred to. If the question and answer taken together are to be construed as an admission of the parties, directly or indirectly, that they had killed Mrs. Greenfield, then taken together they are but the narration of a past event, and become but the declaration of a third party that he, and not the prisoner, had committed the offense, and upon the authorities cited to the last exception were properly

rejected. This principle does not exclude proof of *res gestœ*, and if these declarations are included within that class of evidence it was error to reject them. Were they *res gestœ?* "*Res gestœ* are events speaking for themselves through the instructive words and acts of participants, and not the words and acts of the participants when narrating the events. (Wharton on Cr. Ev., § 262.) They must be concomitant with the principal act, and so connected with it as to be regarded as the mere result and consequence of the coexisting motive. (1 Greenleaf's Ev., § 110.) · They must accompany the act and so harmonize with it as to be obviously a part of the same transaction. (*Moore* v. *Meacham*, 10 N. Y., 207; *Enos* v. *Tuttle*, 3 Conn., 250.) From these and all the authorities, it is evident that declarations to make them *res gestœ* must be the reasonable and natural expression of the party, while doing the particular act which is the subject of the inquiry, which will tend to give character to the act itself or to show the motives or purposes of the party who does it; and the authorities are uniform that if such declarations are but a narrative of past events they are inadmissible as *res gestœ*. Not everything that is said while doing the act is admissible, but only such as give character and effect to it or show the motive or purpose with which it is done. (*O'Kelly* v. *O'Kelly*, 8 Metc., 436–440.)

The *acts* testified to by Wyman were a mere link in the chain of circumstances tending to charge the Kelloggs and Taplin with the offense, and of the class occurring after the act, which are always competent. Alone it was useless for any such purpose, and unless other proof was offered tending to connect the parties with the crime this was entirely ineffectual. There was nothing to show they came from the direction of prisoner's house, or that the gun or bag came from there; and the declarations were not necessary, nor did they tend to illustrate or in any way give character to the acts Wyman had testified to. They related entirely to matters that had before transpired and not to what the parties were then doing, and were not, therefore, *res gestœ* so far as such acts were in question, even if declarations made at the time those parties stood by Taplin's house could be *res gestœ* in the case.

The thing done, or *res gestœ*, was the murder which occurred at another time and place than that at which these parties were; and

it seems a clear proposition that anything said at such other time and place by the parties, indicating that they committed the murder, would necessarily be a naked statement of what they had done, not what they were in the act of doing, and would, therefore, be incompetent. In this respect the case is very like *The People* v. *Davis* (56 N. Y., 96).

There is another and insuperable objection to the admissibility of these declarations as *res gestæ* to the principal act of killing. There is no evidence that these three men were present or had anything to do with the murder, or from which the jury could infer they had. It does not appear that the gun or bag they had was taken from the house of the prisoner; and the language of the declaration that " if they had not done it they would all have been hung," repelled the idea that they referred to the homicide, for if they had killed Mrs. G. they were in great danger of being hung, while if they had not they ran no such risk. The prisoner's counsel, by his offer, assumes without evidence that they committed the crime and asks to prove by their implied admissions they had done so, and thus form the connection between their acts and their declarations. The evidence was properly rejected.

Hiram Snow, a witness for the People, testified that on the evening of the day of inquest, and after prisoner was arrested, he was told by coroner he could get counsel, or answer or decline to answer as he chose. He asked the witness what he should do, who told him, " Orlando, if you are innocent you can answer all the questions they can ask you; if not, you can decline." He said he would answer any question they wanted to ask. The proceedings before the coroner were produced and the prisoner's signature proved to a statement, subscribed by him, stating he declined to answer any question. Other witnesses were called who gave evidence tending to show the prisoner declined to answer questions. The court in charging the jury referred to this evidence and stated to them that the prisoner had the right to decline to answer, and the fact that he refused is not a circumstance which should be taken into consideration against him as one indicating his probable guilt, unless it is accompanied by the statement made by Mr. Snow that if he was guilty he should decline, but if he was innocent he should go on. The latter portion of the charge was excepted to, and

prisoner's counsel requested the court to charge that such refusal to answer could not be considered a circumstance against the prisoner, which was refused and prisoner's counsel again excepted.

The evidence of Snow and of the subsequent refusal of the prisoner to answer the questions put to him was in the case without any objection on the part of the prisoner, and therefore properly in, and could be used for any purpose to which it was properly applicable. As part of his conduct while resting under the charge for the offense, it tended to show a vacillation somewhat suspicious. If, after being advised by the coroner that he could answer or not as he chose, and consulting Snow upon the subject, his reply that he would answer any questions they wanted to ask him is to be deemed a consent by him to submit to an examination, he was thereafter subject to the same presumption as if his subsequent refusal to answer questions had occurred during an actual examination. (*Connors* v. *The People*, 50 N. Y., 242 ; *People* v. *Casey*, 72 id., 393.)

The jury was instructed the prisoner has the right to decline to answer without any imputation of guilt from such refusal, and the court stated to them the only way in which any inference could be drawn from the whole evidence on that subject, without intimating whether any such inference ought to be drawn from it. We think there was no error in this, but if there was it was fully cured by the subsequent action of the court. This is not a case where illegal evidence has been admitted under objection, and remained long enough to make a lodgment on the mind of the jury, and subsequently struck out by the court, as was *Erben* v. *Lorillard* (19 N. Y., 299). It was admitted without objection, and there could no error grow out of it except by the charge of the court in regard to it.

Directly after the charge the court and jury, as appears by the bill of exceptions, went to dinner, and as soon as it was over the court again convened, the prisoner and his counsel and the jury were sent for, and the jury was then instructed that as the evidence relating to the prisoner's declining to answer after the interview between him and Snow was somewhat equivocal, and they might be inclined to give it more weight than it should receive, they were in terms instructed they should not consider the fact of his declining to answer questions as evidence tending in any degree to establish

his guilt in the case, but they should wholly exclude *all such evidence* and what had been said about it in the charge from their consideration, and give it no weight whatever in the case. These instructions were given to the jury probably before they had consulted upon the case, and gave to the prisoner more than he had any right to ask, for it not only gave the charge his counsel asked for, but it withdrew from them the whole evidence upon that subject which had been admitted without objection.

This unconditional direction to the jury that the evidence was no indication of guilt, was sufficient to cure all error in the charge if any existed. The propriety of this course is recognized in *Meyer* v. *Clark* (45 N. Y., 285), and the only difficulty in that case was, the court did not unqualifiedly retract its erroneous charge. In *Chapman* v. *The Erie Railway Co.* (55 N. Y., 579) the court say : "To obviate an erroneous instruction upon a material point, it must be withdrawn in such explicit terms as to preclude the inference that the jury might have been influenced by it." In Thompson on Charging the Jury (§ 93), it is laid down as a rule " that the court has power, at any time during the trial, to modify instructions already given or revoke them entirely if, upon reflection, it concludes they are erroneous," and cites to sustain the doctrine *Sittig* v. *Buhestach* (38 Md., 158), *Jones* v. *Van Patten* (3 Ind., 107), *Hall* v. *State* (8 id., 439–444). All that seems to be necessary is, that the erroneous instructions should be expressly withdrawn from the jury. (*Jones* v. *Talbot*, 4 Mo., 279–285.) A like rule prevails in Massachusetts, *Commonwealth* v. *Snelling* (15 Pick., 333, 334).

After a careful examination of all the exceptions on the part of the prisoner, we are satisfied none of them are well taken.

The conviction is affirmed and the proceedings remitted to the Onondaga Oyer and Terminer, with instructions to appoint a day for the execution of the prisoner in pursuance of the sentence.

TALCOTT, P. J., and HARDIN, J., concurred.

Ordered accordingly.