[No. 3461.]

RUFUS BRYANT v. THE STATE.

1. PRACTICE.— BILLS OF EXCEPTION to the rulings of the trial court in admitting evidence for the State over objections by the defense must set forth the objections which were interposed. Objections not affirmatively presented are to be deemed as waived.
2. MURDER — EVIDENCE.— In a trial for murder a State's witness was permitted, over objection by the defense, to testify that after he had arrested the defendant, and before the defendant was warned about statements he should make, he, the witness, caused the defendant to remove his overshirt and expose his undershirt, and that there were spots of blood upon the undershirt; which garment the witness was also permitted to identify and exhibit to the jury. *Held*, that no valid objection to the admissibility of this proof is apparent.
3. SAME.— Statements voluntarily made by a prisoner after he has been warned of their admissibility against but not for him are competent evidence for the prosecution.
4. SAME — CHARGE OF THE COURT.— When the evidence in a trial for murder has no tendency to prove a less degree of culpable homicide than murder in the first degree, it is proper for the trial court to limit its charge to that degree.
5. FACT CASE.— See circumstantial evidence *held* sufficient to sustain a conviction for murder in the first degree.

APPEAL from the District Court of Colorado. Tried below before the Hon. George McCormick.

The indictment in this case charged the appellant with the murder of Minerva Lynch, in Colorado county, Texas, on the 13th day

of December, 1884. His trial resulted in his conviction of murder in the first degree, and he was awarded a life term in the State penitentiary as his punishment.

Fannie Harris was the first witness for the State. She testified that she lived in the town of Columbus, Colorado county, Texas, a few steps north of the railroad passenger depot. About midnight on the 11th of December, 1884, Minerva Lynch, in company with Charley Wade, came to witness's house, bringing with her a valise, a quilt and a blanket, and asked permission to spend the night in the witness's house, which permission the witness gave, and she remained. Early on the next morning the defendant came to the witness's house to see Minerva. He did not go into the house, and witness did not hear what he or Minerva had to say. Defendant visited witness's house often on that day. He came back that night and asked Minerva to let him come in and sleep with her, which she refused to do. He then asked her to join him outside, which she likewise refused to do. The defendant then left the witness's premises, but came back to see Minerva early on the next morning. Soon after he left, or about 10 o'clock, Minerva left the house. Witness next saw the defendant that night, when he came to her house and asked for the valise which Minerva had left there, from which, he said, he wanted to get a shirt. He said nothing about Minerva at first. Witness told him that Minerva left the house on that morning and had not returned, and asked him where she was. Defendant replied that Minerva was a strange woman; that she would sometimes leave a place and never say where she was going to. He took the valise and went off towards the passenger depot. After a short time he brought the valise back to the witness's house, and asked for the quilt and blanket which Minerva brought to the house. Witness gave them to him. He then left and witness saw no more of him until after his arrest.

Ten or twelve days after the defendant last left the witness's house, the witness saw the dead body of Minerva Lynch in a gully near the banks of the Colorado river, in Colorado county, Texas. The body was partly covered up, and had on the same plaid calico dress that Minerva wore when she last left the house of the witness. The throat was cut from ear to ear. Witness gave the valise to Sheriff J. L. Townsend. It was the same valise Minerva left at her house, and the same valise which the defendant got from the witness on the pretext of getting a shirt from it, and which he returned at the time he got the quilt and blanket. When the defendant came to witness's house for the valise, he said that he was going to Eagle

Lake bottom, east of Columbus, to pick cotton. When he brought the valise back he asked witness to keep it until it was called for by some one. Minerva Lynch came to witness's house on December 11, 1884, and left on the morning of December 13, 1884. Her dead body was found about the last of that month or the first of January, 1885. Witness identified the body, and recognized the dress in which it was clothed as the same dress that Minerva wore when she came to and left the witness's house the last time. She identified the defendant on trial as Rufus Bryant, the man who called at her house several times to see Minerva Lynch, and who got and brought back the valise and took off the quilt and blanket described. This all occurred in Colorado county, Texas, on the dates stated.

Charley Wade was the next witness for the State. He testified that he was employed at the Wootan House in Columbus. He was at the railroad depot on the night that Minerva Lynch came to Columbus. She came to Columbus from the west, on the cars, and when the witness saw her, she was standing alone on the platform with a valise and some bed clothes. She appeared to know no one, and the witness stepped up and spoke to her. She said that she wanted a place to sleep that night. It was then about midnight. Witness told her that he would take her to Fannie Harris's house, a few steps distant from the depot, which he did, and Fannie told her that she could stay there that night. Witness saw her two or three times next day at Fannie's house. She remained at Fannie's house a day and a half and two nights. Witness also saw the defendant at Fannie's house several times on the day after the night of Minerva's arrival. Witness saw Minerva at Fannie's house on the morning of the second day after her arrival, and he also saw the defendant there on that morning. He saw no more of the woman alive, but about two weeks afterwards saw her dead body in a gully near the river. The throat was cut. Witness saw no more of defendant until after his arrest. He had never seen the deceased before the night of her arrival, nor the defendant before the morning of the next day.

Sam Pike was the next witness for the State. He testified that he was at Fannie Harris's house on the first day after Minerva's arrival. He offered Minerva service as a cook on behalf of a lady living in Columbus, and Minerva agreed to accept the employment. While witness was talking to Minerva, at that time, the defendant came to the house, called for Minerva and told her that he wanted to speak to her. She made him no answer. Witness passed by Fannie's house several times on that day, and saw the defendant

there each time.   Minerva agreed to commence her service as cook for the lady spoken of on the next day, and the witness agreed to call and escort her thither.   Witness went to Fannie's house, to fulfil his promise, between the breakfast hour and noon of next day. While in the house talking to Minerva, the defendant called again and told Minerva that he desired to speak to her.   She answered, "After a while."   Defendant then walked across to the depot, and was sitting on the depot steps when the witness left.   Witness went home, and, as the dinner hour approached, went again to Fannie's to get Minerva and escort her to her place of service.   Minerva was gone when the witness arrived.   Fannie Harris said that she had gone to the river.   Witness waited a short time, left, and returned that night.   He then saw the defendant near the railroad depot, putting on a shirt.   After he got his shirt on, the defendant brought a valise to Fannie's house, and asked for the bed clothes Minerva left there.   He made no inquiries about Minerva.   Witness saw no more of defendant until after his arrest, nor did he see Minerva again, alive.   He saw her body, the throat cut, in a gully near the river, some time afterwards.   When witness returned from Fannie Harris's house, just before noon, the time he learned that Minerva had gone to the river, he saw the defendant going down the railroad track towards the river, between the depot and the Wootan House.   When Minerva refused, at Fannie's house, to see defendant, he went to the depot and took a seat on the platform.   Persons on the depot platform could easily see any one leave Fannie's house and go towards the river.   Witness next saw the defendant that night, when he was putting on his shirt, as stated.

J. L. Townsend was the next witness for the State.   He testified that he had been sheriff of Colorado county for the last five or six years.   About the last of December, 1884, witness was notified that the dead body of a woman had been found in a gully near the river. Witness went immediately to the place indicated, and found the dead body of a woman partially covered up.   The lower extremities were uncovered.   From the position of the body the witness judged that the rain of the day before had washed the earth off the portions exposed to view.   The body had been buried at the confluence of two gullies.   Witness uncovered and resurrected the body, and found it to be that of a woman whose throat had been cut from ear to ear.   From appearances the woman had been dead about two weeks.   The hands were cut in several places, indicating that, in the struggle in which she lost her life, the woman had grasped the knife.   A plaid calico dress covered the body, which

was identified by several women as that of Minerva Lynch. Martha Henderson and Fannie Harris were among the women who identified the body. An inquest was held by the coroner, and the proceedings developed the fact that the woman had stopped, some time before, at the house of Fannie Harris. Witness then went to Fannie's house and got a valise which the deceased had left there. Witness opened that valise and examined the contents. Among the clothing witness found a receipt which purported to have been given by W. M. Atkinson, county attorney of Gonzales county, to one Rufus Bryant. Upon getting this receipt witness went immediately to Gonzales. Assisted by Captain W. E. Jones, sheriff of Gonzales county, witness soon learned that there was a Rufus Bryant in Gonzales county, and that he could be found upon Mr. Barbour's place, near the town of Gonzales. Witness speedily effected the arrest of Rufus Bryant, the defendant on trial, and identified him as a party he, witness, saw in and about the depot in Columbus between the 11th and 13th days of December, 1884.

When the witness first made the arrest of the defendant he noticed several small spots of blood on his pants. Witness warned defendant that he was not required to make any statement whatever to him; that he could do so if he wished, but that the same could be used in evidence against him, but not in his behalf. Several persons were present. When witness directed attention to the blood spots on the defendant's pants, he said that they were tobacco stains and not blood spots. Witness then informed the defendant that he was arrested upon the charge of murdering Minerva Lynch, near Columbus in Colorado county. Defendant then said that he was in Columbus during the month of the preceding December. Witness then caused the defendant to pull off his shirt, and when he did so the sleeves of his undershirt were found to be very bloody from the wrists to the elbows. The undershirt was also bloody on the back of one shoulder. This blood on the shoulder seemed to have got there by contact with a bloody hand, the prints of fingers being discernible to witness. Defendant at this time made no statement or explanation as to how his undershirt became so bloody.

Having made the discoveries narrated, the witness placed the defendant in the Gonzales county jail, to await the departure of the train for Columbus, which delay consumed several hours. When he took defendant out of jail to start with him to Columbus, defendant volunteered the statement that he got the blood on his undershirt in butchering a hog for Mr. Clark Barbour. He stated at the same time that the bloody undershirt was the same one he had on in Co-

lumbus,— that while in Columbus he changed his overshirt but did not change his undershirt. He made his change of overshirts, he said, on the platform of the railroad depot in Columbus; that he went to Fannie Harris's house, got a valise and carried it to the platform, where he took out an overshirt and made the change. He stated further that he had not changed clothing since he left Columbus, and that he was then wearing the same pants he had on in Columbus.

Witness produced the receipt from W. M. Atkinson, county attorney of Gonzales county, to Rufus Bryant, and the valise and contents just as he received them from the hands of Fannie Harris. They had been in his possession ever since he got them from Fannie Harris. He produced also the overshirt, undershirt and pants that the defendant was wearing when arrested, and exhibited the same to the jury. The overshirt had no blood on it, nor did it have any blood on it when he arrested the defendant. Defendant told witness that he had on that overshirt when he butchered the hog for Clark Barbour. Witness was neither a blood expert nor a physician, but would swear that, to the best of his knowledge and belief, the substance on the undershirt and pants was blood. The valise contained several articles of female apparel, dresses, sacques, etc. Defendant did not tell the witness what he did with the shirt he pulled off at Columbus. The receipt spoken of reads as follows:

"Gonzales, Oct. 31, 1883.

"Received of Rufus Bryant the sum of forty-five $\frac{50}{100}$, the same being balance due on fine and costs in justice court, precinct No. 5, Gonzales county, in a case in which the State of Texas recovered a judgment against said Bryant for unlawfully carrying a pistol.

"W. M. Atkinson,

"Co. Atty."

Martha Henderson was the next witness for the State. She testified that on or about the 12th or 13th of December, 1884, she saw a woman going, alone, from Fannie Harris's house in Columbus towards the river. That woman had on a plaid dress. About the last day of the same month witness was present at an inquest held over the dead body of a woman which was found in a gully near the town of Columbus. She identified the body as that of the woman she saw going from Fannie Harris's house towards the river on the occasion mentioned. The dress was the same that that woman had on on that occasion. Witness was not acquainted with the deceased.

W. H. H. Wade testified, for the State, that he lived in the town of Luling. He knew the defendant as Rufus Bryant. He knew

Minerva Lynch, said to be deceased, and had her in his employ during the month of November, 1884. Witness saw the defendant in bed with Minerva on several different mornings. Witness did not have the defendant in his employ. Witness's wife hired Minerva in Gonzales. She was at witness's house in his employ some week or two before the defendant made his appearance. Witness prohibited defendant coming on his place, and in a short time Minerva quit working for witness, and she and defendant left together. Witness did not know where they went.

Mrs. W. H. H. Wade was the next witness for the State. The valise and contents were exhibited to witness, and she identified several articles of clothing as the property of Minerva Lynch, particularly an apron which she, witness, had made and sold to the said Minerva. She hired Minerva in Gonzales and took her to Luling in Caldwell county. This was in October, 1884. She knew nothing of the defendant at that time. Shortly after she hired the deceased the defendant made his appearance in Luling.

Jake Lynch, the father of the deceased, was the next witness for the State. He testified that about three months before Christmas, 1884, the defendant, who was married to another daughter of the witness, took Minerva off with him. He had not lived with his wife for some time before his elopement with Minerva. Witness did not know where the two parties went to. The defendant was gone about two weeks, and returned home some two months before Christmas. He did not say where he took Minerva to, nor where he had left her. When he returned he went back to his wife and lived with her until his arrest. The first time that the defendant went off with Minerva, the witness ascertained their whereabouts, followed and brought Minerva back home, but defendant got Minerva again next day and took her off again. Witness was at the railroad depot in Gonzales when the defendant returned the last time before Christmas, and saw him get off the train. He acted very strangely on that occasion, refused to speak to witness, and started off through the mesquite brush.

Clark Barbour testified, for the State, that he lived in Gonzales county. Both the defendant and the deceased lived with witness at one time. Defendant was married to Minerva's sister, but had not lived with her for some time prior to his elopement with Minerva, which occurred some two months before Christmas, 1884. He returned about December 15, and lived with his wife until his arrest. A few days after defendant returned to witness's house, witness caught a hog in the pasture and tied it down. This was

about dinner time. Late in the evening he sent a colored man named Will Withers after the hog. Withers returned and said that he could not get the hog into the wagon without help, and witness sent the defendant to help him. Witness did not see the hog when it was brought to the house. The weather was very cold. Having worked for the witness some eight or ten days after his return, the defendant came to witness and told him that he was going to quit, and said something about owing some money. Witness offered to pay his debts for him, when he said that it was useless to pay out money for him, as he was going to leave the d—d country. This was but a day or two before his arrest. Defendant had never butchered a hog for witness. The only hog he ever had anything to do with for the witness was the one witness tied down in the pasture.

Frances Williams testified, for the State, that he (or she) saw the defendant in the town of Columbus about two weeks before Christmas, 1884. He came to witness's house very early one morning, before the witness was out of bed, and brought some bed clothes with him. Witness saw no more of him until after his arrest.

Will Withers, for the State, corroborated the testimony of Mr. Clark Barbour with regard to the hog tied down in the pasture, and testified in addition that the hog was dead and stiff when he (alone) first found it. Defendant stabbed the hog as it lay dead on the ground, and assisted witness put it in the wagon, but, if he got any blood on his clothes in doing so, witness did not see it or know it. The State closed.

Laura Bryant, the defendant's wife, was the only witness in his behalf. She testified that the defendant left with Minerva and was gone about two months, returning a week or so before Christmas, 1884, after which time until his arrest he lived with the witness. The witness saw the defendant shoulder the hog spoken of by the witnesses Barbour and Withers, and carry it from the wagon into the house. The overshirt the defendant had on when arrested was the same shirt he had on when he got back home, and the same one he had on when he carried the hog. Witness identified the shirt in evidence as the one she alluded to. She did not know what kind of an undershirt he had on, as she never saw it to know it. Witness did not change his clothes from the time of his return home until his arrest.

The motion for new trial complained that the verdict was not supported by the evidence, and that the charge of the court was upon abstract propositions of law not applicable to the facts, and was upon the weight of evidence.

No brief for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WILLSON, JUDGE.  I.  Sheriff Townsend, a witness in behalf of the State, was permitted to testify that he arrested the defendant on this charge; that, while having him under arrest, he caused him to remove his overshirt and expose to view his undershirt, which had spots of blood upon it, and that said witness at that time had not warned defendant that statements made by him might be used in evidence against him.  Said witness was also permitted to identify said undershirt, and to exhibit the same to the jury for their inspection.  Defendant saved a bill of exceptions to the ruling of the court admitting this evidence, but we are not informed by said bill of the objection, or objections, made to the admissibility of said evidence.

In *Mayo* v. *The State*, 7 Texas Ct. App., 342, it is said: "Inasmuch as the judge cannot discuss or comment upon the proposed evidence, but must simply decide upon the objections made to it, it seems fair to infer that all objections intended to be relied on must be clearly stated, so that he may act in reference to all, and that a failure to assert any objection would be tantamount to a waiver of all objections not affirmatively presented."  This rule is now well settled by repeated decisions of this court.  ( *Walker* v. *The State*, 9 Texas Ct. App., 200; *King* v. *The State*, 13 Texas Ct. App., 277; *Davis* v. *The State*, 14 Texas Ct. App., 645.)  We will say, however, that in our opinion no valid objection could have been made to the competency of said evidence.  (Whart. Cr. Ev., § 777; *People* v. *Gonzales*, 35 N. Y., 49; Burrill on Cir. Ev., pp. 259, 260; 1 Best's Ev., § 201; *Com.* v. *Sturtevant*, 117 Mass., 122; *Hart* v. *The State*, 15 Texas Ct. App., 202; *Meyers* v. *The State*, 14 Texas Ct. App., 35; *Walker* v. *The State*, 7 Texas Ct. App., 245.)

II.  Defendant's second bill of exceptions is defective in the same particular as the first.  It does not inform us upon what ground or grounds he objected to the alleged incompetent evidence.  This evidence, however, also appears to us to be free from any valid objection.  Although the defendant was under arrest when he made the statements objected to, still it was proved that he made the same voluntarily, and after having first been cautioned by the officer having him in custody that any statements made by him might be used in evidence against him.  (Code Crim. Proc., art. 750; *Harris* v. *The State*, 6 Texas Ct. App., 97; *Waite* v. *The State*, 13 Texas Ct. App., 169.)

III. Several objections are made, in defendant's motion for a new trial, to the charge of the court, but no exceptions were taken to the charge at the time of the trial.    Several special charges were requested by the defendant, and refused by the court.    We have closely examined and fully considered the sufficiency and correctness of the court's charge as given to the jury.    It is in the main correct, and embraces all the law applicable to the evidence. It did not submit the law of murder in the second degree, nor did the evidence demand any other instructions than as to murder in the first degree.    There are, we think, some immaterial errors in the charge, but they are of a character which manifestly could not have prejudiced the defendant; but, on the other hand, whatever influence they might have had upon the minds of the jury must have been favorable to the defendant.    As to the special charges which were refused, in so far as they were correct and applicable they had been fully embraced in the charge given to the jury.

IV. While the evidence upon which this conviction is founded is circumstantial, it is, to our minds, sufficiently cogent and certain to place the defendant's guilt of the murder beyond all reasonable doubt, and to exclude every reasonable hypothesis of his innocence. We find no error in the conviction, and the judgment is affirmed.

*Affirmed.*

[Opinion delivered April 29, 1885.]